STATE of Minnesota, by David BEAU-
LIEU, Commissioner, Department of
Human Rights, Respondent,

v.

CITY OF MOUNDS VIEW, Minnesota,
et al., Relators.

No. C3–92–1780.

Court of Appeals of Minnesota.

April 13, 1993.

Review Granted June 9, 1993.

Mary A. Rice, David J. Hoekstra, Jardine, Logan & O'Brien, St. Paul, for relators.

Hubert H. Humphrey, III, Atty. Gen., Stephen L. Smith, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Considered and decided by LANSING, P.J., and SCHUMACHER and HARTEN, JJ.

## OPINION

LANSING, Presiding Judge.

This is an administrative action under the Minnesota Human Rights Act in which the City of Mounds View asserts official immunity as a bar to a discrimination claim against the city and two of its police officers.

## FACTS

In a complaint filed with the Department of Human Rights, Lateesa Agunbiade alleged that Mounds View police officers' investigatory stop of her car was an unfair discriminatory act against her and her fourteen-year-old son. The stop was in connection with a police investigation of a robbery of the Spring Lake Park VFW Post.

Mounds View police officers Jack Chambers and Larry Siluk received a police dispatch immediately after the robbery. The dispatch described the suspect as a black male, 5' 7" to 5' 10" tall, with short hair, and wearing dark clothing. The officers responded to the communication by driving northwest on Highway 10 toward the VFW post.

At the intersection of Highway 10 and County Road I, Chambers and Siluk saw a gray vehicle with two black occupants. The passenger was a male with short hair and wearing dark clothing. The officers turned to follow the vehicle and radioed that they were pursuing a possible suspect.

Chambers and Siluk stopped the car at the intersection of Highway 694 and Snelling Avenue. The stop was conducted consistent with felony-stop procedures which includes the officers drawing their guns and ordering the occupants out of the car. The officers detained the Agunbiades for approximately fifteen minutes before concluding that they had no connection with the robbery.

The Human Rights Department found probable cause to credit the allegations of racial discrimination. The department issued a charge against the City of Mounds View and its two officers alleging racial discrimination in violation of Minn.Stat. § 363.03, subd. 4(1) (1990) by denying the Agunbiades full utilization or benefit from a public service.

Prior to the administrative hearing, the city filed a prehearing brief asserting that this action was barred by the doctrines of qualified and official immunity, and that the officer's conduct in executing the investigatory stop was constitutionally valid. Treating the immunity arguments raised as a motion for summary judgment, the administrative law judge (ALJ) concluded that an action brought against police officers under the Minnesota Human Rights Act is not barred by qualified or official immunity.

## ISSUE

Does the doctrine of official immunity bar a claim of racial discrimination brought against police officers under the Minnesota Human Rights Act?

## ANALYSIS

The immunity defense in this appeal is limited to the common law doctrine of official immunity. The city did not appeal the ALJ's ruling on the inapplicability of qualified immunity. *See Elwood v. County of Rice*, 423 N.W.2d 671, 677 (Minn.1988) (federal immunity principles developed under 42 U.S.C. § 1983 do not control state law or supplant common law doctrine of official immunity). Neither has the city asserted discretionary function immunity under Minn.Stat. § 466.03, subd. 6 (1990).

In its claim of official immunity, the city has not distinguished its liability from the liability of the officers. *See Pletan v. Gaines*, 494 N.W.2d 38, 42–43 (Minn.1992) (no bright-line rule defines when vicarious official immunity extends to the governmental employer). Because this composite

treatment does not affect our analysis, we do not separate the employees from the governmental entity for our review.

## I

■ Official immunity is a common law doctrine that protects a public official's exercise of judgment or discretion by eliminating personal liability for damages except when the action constitutes a willful or malicious wrong. *Elwood,* 423 N.W.2d at 677; *Susla v. State,* 311 Minn. 166, 175, 247 N.W.2d 907, 912 (1976). Generally, police officers are classified as discretionary officers entitled to official immunity. *Johnson v. Morris,* 453 N.W.2d 31, 42 (Minn.1990); *Elwood,* 423 N.W.2d at 678.

Minnesota courts have freely applied official immunity to police officers acting in their discretionary capacity in a variety of tort actions. *See, e.g., Pletan,* 494 N.W.2d at 41 (wrongful death action); *Elwood,* 423 N.W.2d at 679 (trespass and battery claims); *Reuter v. City of New Hope,* 449 N.W.2d 745, 751 (Minn.App.1990) (assault and false imprisonment), *pet. for rev. denied* (Minn. Feb. 28, 1990).

■ Whether common law official immunity applies to actions other than torts has apparently not been decided in Minnesota; neither the city nor the state could find a case applying official immunity to a statutory cause of action. Our issue, however, is narrower. We need not decide whether official immunity applies generally to statutory causes of action, but only whether the doctrine applies to the Human Rights Act, a comprehensive legislative act which, although allowing for a separate civil action, is essentially an administrative remedy.

In the two reported cases dealing with Human Rights Act claims against peace officers, official immunity was neither asserted nor addressed. *See City of Minneapolis v. Richardson,* 307 Minn. 80, 89, 239 N.W.2d 197, 203 (1976) (applying Minn.Stat. § 363.03, subd. 4 to police conduct in dealing with public); *Rosenbloom v. Flygare,*

487 N.W.2d 546 (Minn.App.1992) (deputy sheriff liable under the Human Rights Act for racially discriminatory conduct in county jail), *pet. for rev. granted* (Minn. Oct. 20, 1992). In fact, official immunity has never been invoked within the context of a Minnesota Human Rights Act claim, and we are, therefore, compelled to address the application of official immunity in this case without the benefit of direct precedent.

■ The test for determining whether common law doctrines apply to legislative enactments is whether the doctrine is consistent or inconsistent with the legislative intent in enacting the statute. *Astoria Fed. Sav. & Loan Ass'n v. Solimino,* — U.S. —, —, 111 S.Ct. 2166, 2170–71, 115 L.Ed.2d 96 (1991) (determining whether common law repose doctrines apply to administrative decisions). When a statute contains no express delimitation, courts should also consider the common law adjudicatory context providing background to the legislative act. *Astoria,* — U.S. at —, 111 S.Ct. at 2169.

The Minnesota Human Rights Act admits of no immunities specifically, and Minn. Stat. § 363.02 (1990), which establishes exemptions to the Act, does not incorporate an exemption for police officers or any public official acting in a discretionary capacity.

The state advances three provisions in the Human Rights Act as inconsistent with an application of official immunity. These include Minn.Stat. § 363.03, subd. 4 (1990) which prohibits discrimination with respect to any public service;[1] Minn.Stat. § 363.06, subd. 4(1)(d) (1990) which requires that priority be given by the Commissioner to claims when the respondent is a government entity; and Minn.Stat. § 363.071, subd. 2 (1990) which limits the personal liability for punitive damages of members of a political subdivision governing body.

The first two provisions express an intention that the Act apply to government enti-

---

**1.** "Public service" is defined as "any public facility, department, agency, board or commission owned, operated or managed by or on behalf of the state of Minnesota, or any subdivision there-

of, including any county, city, town, township, or independent district in the state." Minn.Stat. § 363.01, subd. 34 (1990).

ties, but neither provision is directly inconsistent with extending official immunity to a government employee. Read in conjunction with Minn.Stat. § 363.06, subd. 1 (1990) requiring that the charge must state the name of the person alleged to have committed the discriminatory act, an implication arises that government officials and employees are subject to the Act. The provisions could still be read, consistent with official immunity, to apply to nondiscretionary acts of government employees.

The final provision advanced, the limitation of certain public officials' personal liability for punitive damages, does demonstrate, if not inconsistency, a legislative intent to define immunity within the provisions of the Act. Although decisions by members of a governing body of a political subdivision would usually be protected by discretionary function or discretionary act immunity, they could be involved in ministerial acts that would not be protected by official immunity. In that context applying the official immunity doctrine would be inconsistent with section 363.071, subd. 2.

More significantly, this approach of defining immunity within the Act demonstrates an intent to legislate immunity on a case-by-case basis rather than assuming a general inclusion of official immunity in all statutes. A review of Minnesota statutory law shows that often when the Legislature intends for public employees to have immunity for their official conduct, it has expressly provided the scope and definition of the immunity. *See, e.g.*, Minn.Stat. § 626.-556, subd. 4(b) (1992) (social workers immune from civil and criminal liability if acting in good faith and exercising due care); Minn.Stat. § 125.09, subd. 5 (1992) (school board members immune for official actions done in good faith and with due care); Minn.Stat. § 299C.64 (1992) (Bureau of Criminal Apprehension immune if acting in good faith); Minn.Stat. § 60G.08 (1992)

(Department of Commerce, its Commissioner, and employees immune from liability for any action taken in the performance of their powers and duties). The specific integration of statutory immunities that parallel, rather than alter, the contours of common law official immunity further emphasizes that official immunity is not implicit in all statutory enactments.

In considering the background of common law adjudicatory principles at the time the Legislature passed the Human Rights Act, we observe initially that the immunity landscape was significantly different. The public service provision at issue was enacted in 1967. 1967 Minn.Laws ch. 897, § 7. In 1962 the Minnesota Supreme Court had overruled sovereign tort immunity as a defense to tort claims against local government units. *See Spanel v. Mounds View School District No. 621*, 264 Minn. 279, 118 N.W.2d 795 (1962). Abolishment of the state's tort immunity was yet to come. *See Nieting v. Blondell*, 306 Minn. 122, 235 N.W.2d 597 (1975); 1976 Minn.Laws ch. 331, § 33. The Human Rights Act prohibition against discrimination in public services included public services provided both by the state and the local units of government.

The 1967 Act made no distinction between the units of government protected by sovereign immunity and those unprotected. It reintroduced no immunities or exceptions for acts of employees or the employing unit of government. Given this background and the essential nature of the Human Rights Act that seeks to impose direct responsibility for discriminatory acts, we find no legislative intent that would support an incorporation of official immunity into the Act and a number of indications that such an incorporation is inconsistent.[2]

Finally, neither the city nor the state has provided a definitive assessment of the ef-

---

**2.** From the enactment of the Human Rights Act's first provisions in 1955, until sovereign immunity was abolished by judicial and legislative action in 1976, official immunity was a dormant doctrine. A review of the case law reveals that during those two decades immunity for public officials from common law tort claims was given only one vague reference. *See*

*Johnson v. Callisto*, 287 Minn. 61, 176 N.W.2d 754 (1970). The dormancy of the doctrine during the decades when the Human Rights Act was evolving bolsters our conviction that the Legislature intended to hold public officials liable for their discriminatory acts without regard for official immunity.

fect of official immunity on Human Rights Act enforcement against government units. The ALJ's decision suggests that because intentional acts of discrimination equate to willful or malicious acts unprotected by official immunity, the application of official immunity to the Act would not have great impact. *See Rico v. State*, 472 N.W.2d 100, 107 (Minn.1991) (malice in this context is the intentional doing of a wrongful act without legal justification). We are not entirely persuaded that the application would be negligible. If a government employee is immune because of official immunity and the employer is immune because of discretionary function immunity, the Act would not attach to discriminatory actions by the governmental unit. *See id.* at 104–06. Similarly, if the governmental unit received the benefit of vicarious official immunity, the Act could not reach government action. *See Pletan*, 494 N.W.2d at 41–43. It is clear from the text of the Act that the Legislature intended the Act to address discriminatory practices in public bodies as well as private entities. To substantially limit the Act's application would thwart its essential remedial purpose.

## II

We recognize that public policy supports not only the strong enforcement of the Human Rights Act but also supports law enforcement officers' prompt exercise of independent judgment in emergency situations. *See Pletan*, 494 N.W.2d at 40. In applying the protections of the Human Rights Act to police activity in *Richardson*, the court adopted a standard which we read as striking a balance between insuring proper law enforcement and nondiscriminatory public services.

■ The standard for unfair discrimination practice requires (1) an adverse difference in treatment with respect to public services of one or more persons when compared to the treatment accorded others similarly situated except for an impermissible factor such as race, color, creed, sex, etc., or (2) treatment so at variance with what would reasonably be anticipated absent discrimination, that discrimination is the prob-

able explanation. *Richardson*, 307 Minn. at 87, 239 N.W.2d at 202.

Careful attention to this standard and the elements of a prima facie case created under this standard is necessary. We do not lose sight of the fact that police officers are permitted under established constitutional standards to stop individuals based partly on their race. *See Buffkins v. City of Omaha*, 922 F.2d 465, 468 (8th Cir.1990) (officer's identification of plaintiff was reasonable and nondiscriminatory in light of the fact that her race matched the racial description of the person in the tip); *United States v. Fouche*, 776 F.2d 1398, 1402–03 (9th Cir.1985) (where broadcast description stated that suspect was a black male, officers could permissibly consider race as one factor in deciding to make an investigatory stop of defendant's vehicle).

When the threat of personal liability could significantly inhibit the independent and effective performance of duty, courts have relied on standards related to reasonableness. *See Rico*, 472 N.W.2d at 108 (supreme court incorporated reasonableness standard into indemnity provisions). "[R]easonableness is still the ultimate standard" under the Fourth Amendment. *Soldal v. Cook County, Ill.*, ─ U.S. ─, ──, 113 S.Ct. 538, 549, 121 L.Ed.2d 450 (1992).

■ We think the objective standards enumerated in *Richardson* implicitly embrace the concepts of reasonableness. "Reasonableness" in the context of the Fourth Amendment has entailed an analysis of whether the action is constitutionally permissible. Under the standard in *Richardson*, a claim of racial discrimination in the context of a constitutionally permissible stop requires the claimant to produce facts beyond merely the mistaken, but lawful, stop of a suspect's vehicle in order to establish a prima facie case of discrimination. These are issues to be resolved through further proceedings.

### DECISION

We affirm the administrative law judge's denial of summary judgment and hold that official immunity does not apply to discrim-

ination claims under the Minnesota Human
Rights Act.

**Affirmed.**