STATE of Minnesota, by David BEAU-
LIEU, Commissioner, Department of
Human Rights, Respondent,

v.

CITY OF MOUNDS VIEW, Minnesota,
et al., petitioners, Appellants.

No. C3-92-1780.

Supreme Court of Minnesota.

June 30, 1994.

Mary A. Rice, David J. Hoekstra, St. Paul, for relator.

Hubert H. Humphrey, III, Atty. Gen., Richard L. Varco, Jr., Asst. Atty. Gen., St. Paul, for respondent.

Carla J. Heyl, League of Minnesota Cities, Shoreview, for amicus curiae.

## OPINION

TOMLJANOVICH, Justice.

We are asked to decide whether the defense of official immunity is available to police officers sued for racial discrimination under the Minnesota Human Rights Act, Minn.Stat. § 363.03, subd. 4(1) (1990), and if the defense is available, whether petitioners were properly denied summary judgment.[1] The court of appeals held that the official immunity doctrine does not apply to a claim asserted under the Human Rights Act and affirmed the administrative law judge's order denying summary judgment. We reverse in part, affirm in part, and remand for further proceedings.

The case arises out of an investigatory stop of Lateesa Agunbiade and her 13–year–old son, Adewale Agunbiade, who are African American, by three Mounds View police officers. On October 19, 1989, police officers Jack Chambers, Larry Siluk, and Lieutenant David Brick received a police dispatch that an armed robbery had just occurred at the VFW post on Pleasant View Drive in Spring Lake Park. The dispatch described the suspect as a black male wearing black clothing

and a shiny black shirt. The dispatch reported that the suspect had left on foot with the direction of travel unknown.[2]

All three officers responded to the dispatch. Officers Chambers and Siluk responded by driving northwest on Highway 10 toward the VFW post in an unmarked car. Lieutenant Brick responded by driving northwest on Highway 10 in a marked car. Brick was some distance behind Siluk and Chambers. The officers intended to cut off possible escape routes the suspect may have taken from the VFW. Siluk and Chambers were to proceed from Highway 10 to County Road I en route to the VFW. Brick was to proceed west on Highway 10 instead of turning onto County Road I.

At the intersection of Highway 10 and County Road I, Chambers and Siluk pulled into the left-hand lane to turn onto County Road I. While waiting for the stop light to change they observed a light-colored car with two occupants traveling eastbound on County Road I come to a stop at the intersection. The officers observed that the passenger was a black male with short-cropped hair wearing a dark colored shirt or sweater. The officers observed that the driver was black, but could not determine the driver's gender or any other physical characteristics. The car was in fact being driven by Lateesa Agunbiade and the passenger was her 13–year–old son, Adewale Agunbiade.

The officers made a U-turn to follow the Agunbiades and radioed Officer Brick that they were pursuing a possible suspect. When Brick reached the intersection of County Road I and Highway 10, he made a U-turn and joined the pursuit. According to Siluk and Chambers, as they followed the Agunbiades' car, they noticed the following: (1) the car was traveling a high rate of speed and faster than the flow of traffic; (2) the car

1. Minn.Stat. § 363.03, subd. 4 provides: "It is an unfair discriminatory practice:

   (1) To discriminate against any public person in the access to, admission to, full utilization of or benefit from any public service because of race, color * * *."

2. Chambers later recalled that the initial radio dispatch described the suspect as a black male, 5'7" to 5'10" tall, with close-cropped hair, a dark

complexion wearing a black shirt and black pants. Chambers recollection of the initial radio dispatch is not supported by the record of that transmission.

Lieutenant Brick testified that while proceeding toward the scene, the officers received a second dispatch with additional information about the suspect. Police records, however, indicate that a second dispatch did not go out until 10:28 a.m., well after the events in question.

appeared to be weaving in and out of traffic, sometimes without making proper turn signals; and (3) the passenger turned around to do something in the back seat. Brick, who was in the marked car, stopped the vehicle.

Lateesa and Adewale Agunbiade dispute the officers' description of these events. Lateesa Agunbiade asserts that she was not speeding and that she properly changed lanes once or twice, using appropriate turn signals. Adewale Agunbiade asserts that he did not turn around to look in the backseat of the car until he heard Brick's siren, just before the car was stopped.

Brick ultimately stopped the Agunbiades at the intersection of Highway 694 and Snelling Ave. The officers executed standard felony stop procedures. Brick pulled behind the vehicle, and Siluk and Chambers pulled in front. Brick exited his car, drew his weapon, and ordered the Agunbiades to place their hands on the windshield. Brick then ordered the driver, Lateesa Agunbiade, out of the car. Brick next ordered the passenger, Adewale, out of the car and frisked him for a weapon.

During the stop, the officers identified the driver of the vehicle as Lateesa Agunbiade and the passenger as her son. The Agunbiades were informed that they had been stopped in part because the suspect had been seen leaving the VFW post in a gray car, even though the officers did not in fact have knowledge that a car was used in the robbery. After telling the Agunbiades why they had been stopped, the officers determined that they were not suspects and released them. The Agunbiades were detained for approximately 15 minutes before they were released.

On March 26, 1990, Lateesa Agunbiade, on behalf of herself and her son, filed a charge of racial discrimination against the Mounds View Police Department with the Department of Human Rights ("the department"). On March 14, 1991, the department found

probable cause to believe that defendants (the City of Mounds View, Chambers and Siluk), had committed an unfair discriminatory practice by denying the Agunbiades full utilization or benefit from a public service on account of their race.[3] The department filed a formal complaint against appellants on January 17, 1992. Prior to administrative hearing, defendants filed a prehearing brief asserting that the department's action was barred by the doctrines of qualified and official immunity. Treating the immunity arguments raised as a motion for summary judgment, the Administrative Law Judge concluded that an action brought against police officers under the Human Rights Act is not barred by qualified or official immunity. Defendants appealed the ALJ's ruling on the inapplicability of official immunity.[4] The court of appeals affirmed the ALJ's conclusion that official immunity did not apply to a claim brought under the Human Rights Act. *State by Beaulieu v. City of Mounds View,* 498 N.W.2d 503. This appeal followed.

### I.

■ At issue is whether the common law doctrine of official immunity applies to an action under the Minnesota Human Rights Act against police officers for alleged racial discrimination in stopping people suspected of criminal wrongdoing. The doctrine of official immunity "provides that 'a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong.'" *Elwood v. Rice County,* 423 N.W.2d 671, 677 (Minn.1988) (quoting *Susla v. State,* 311 Minn. 166, 175, 247 N.W.2d 907, 912 (1976)). The purpose of official immunity is to protect "public officials from the fear of personal liability that might deter independent action and impair effective performance of their duties. *Id.* at 678.

We have recognized that generally the duties of police officers call for the exercise

---

3. Lieutenant Brick was not named as a defendant.

4. Appellants did not appeal the ALJ's ruling on the inapplicability of qualified immunity. Qualified immunity is a federal law doctrine that has

been applied by courts in the context of federal civil rights cases arising under 42 U.S.C. § 1983. The ALJ held that qualified immunity cannot be raised with respect to an action arising under state law.

of significant judgment and discretion. *See Pletan v. Gaines,* 494 N.W.2d 38, 41 (Minn. 1992); *Elwood,* 423 N.W.2d at 678–79. Official immunity is provided to police officers because "the community cannot expect its police officers to do their duty and then to second-guess them when they attempt conscientiously to do it." *Pletan,* 494 N.W.2d at 41. In *Pletan,* we held the decision to engage in and to continue a high-speed chase of a criminal suspect is protected by official immunity. We noted that the decision to engage in a car chase had to be reached "under emergency conditions with little time for reflection and often on the basis of incomplete and confusing information." *Id.*

In this case, police officers engaged in an investigatory stop of persons suspected of having committed an armed robbery only minutes before. The decision to stop and detain an armed robbery suspect, like the decision to engage in a high-speed car chase, requires a significant degree of independent judgment and discretion. The officers were required to weigh a multitude of factors requiring the exercise of their judgment and discretion under trying circumstances.

This is apparently the first time in which official immunity has been invoked as a defense to a discrimination claim brought under the public service provision of the Minnesota Human Rights Act, Minn.Stat. § 363.03, subd. 4.[5] The department argues that official immunity is limited to common law tort claims.

This court has not heretofore distinguished between common law and statutory causes of action in applying official immunity, but rather, has broadly defined official immunity to apply to any claim against public officials involving personal liability "for damages." Moreover, this court has long followed the presumption that statutory enactments are consistent with common law doctrines. *Wirig v. Kinney Shoe Corp.,* 461 N.W.2d 374, 377 (Minn.1990). If a statutory enactment is to abrogate common law, the abrogation must be by express wording or necessary implication. *Id.* at 378.[6] It is apparent that nothing in the Human Rights Act expressly disallows official immunity as a defense to a claim brought under the act. We focus our attention on whether the act abrogates the doctrine by necessary implication.

The court of appeals suggests that to apply the doctrine of official immunity to a racial discrimination claim under section 363.03, subdivision 4, of the Human Rights Act would thwart its essential remedial purpose. *Beaulieu,* 498 N.W.2d at 507. This is a valid concern and one that merits careful scrutiny. The manifest purpose of section 363.03, subdivision 4, of the Human Rights Act is to eradicate discrimination in the provision of public services, including the provision of law enforcement services.

We do not believe that allowing public officials to assert the defense of official immunity to a claim under Minn.Stat. 363.03 will undermine the remedial purpose of the statute. Significantly, the doctrine of official immunity does not protect public officials from personal liability when they commit a malicious or willful wrong. Therefore, official immunity would only bar discrimination claims brought under Minn.Stat. § 363.03, subd. 4 where there was no showing of willfulness or malice.

A comparison of the standards we have articulated for a finding of discrimination under Minn.Stat. § 363.03, subd. 4, with a standard requiring a finding of willfulness or malice indicates that the practical impact of allowing official immunity to be asserted as a defense to discrimination claims under Minn. Stat. § 363.03 will be at most negligible. In

---

5. In their claim of official immunity, appellants have not distinguished the liability of the city of Mounds View from the liability of officers Siluk and Chambers. No bright-line rule defines when vicarious official immunity extends to a governmental employer. *Pletan,* 494 N.W.2d at 42. Under the facts of this case we conclude that if the defense of official immunity is available to the officers, it extends to the city of Mounds View.

6. The court of appeals erroneously applied federal law in stating that the test for whether common law doctrines apply to legislative enactments is whether the doctrine is consistent or inconsistent with legislative intent in enacting the statute. *Beaulieu,* 498 N.W.2d at 505.

*City of Minneapolis v. Richardson*, 307 Minn. 80, 87, 239 N.W.2d 197, 202 (1976), we stated that an unfair discriminatory practice under section 363.03, subd. 4, occurs where the record establishes:

> (1) an adverse difference in treatment with respect to public services of one or more persons when compared to the treatment accorded others similarly situated except for the existence of an impermissible factor such as race, color * * *; or (2) treatment so at variance with what would reasonably be anticipated absent discrimination that discrimination is the probable explanation.

Meanwhile, we have stated that in determining whether an official has committed a malicious wrong, the fact finder considers whether the official has intentionally committed an act that he or she had reason to believe is prohibited. *Rico v. State*, 472 N.W.2d 100, 107–08 (Minn.1991). The *Rico* standard contemplates less of a subjective inquiry into malice, which was traditionally favored at common law, and more of an objective inquiry into the legal reasonableness of an official's actions.

We believe there are few circumstances where a public official might be deemed to have committed a discriminatory act under Minn.Stat. § 363.03, subd. 4, and yet be deemed not to have committed a malicious or willful wrong under the principally objective standard set forth in *Rico*. Both inquiries center around the objective reasonableness of an official's actions.

In finding the official immunity doctrine inconsistent with the Human Rights Act, the court of appeals also finds significant that a provision of the Human Rights Act, Minn. Stat. § 363.071, subd. 2, limits the personal liability for punitive damages of certain public officials.[7] *Beaulieu*, 498 N.W.2d at 507. We do not believe this provision impliedly abrogates an immunity defense. The provision can be read in conjunction with official immunity to mean that a public official who commits a willful or malicious wrong is liable for compensatory but not punitive damages.

▮▮ Because we find that the Human Rights Act does not abrogate the doctrine of official immunity either by express wording or by necessary implication, we hold that the defense may be asserted in a claim brought under the act's public service provision. It should be kept in mind that whether official immunity applies to a particular alleged Human Rights Act violation depends on the nature of the governmental duty being discharged by the defendants. If a government employee should commit an act of discrimination during the performance of a ministerial duty, official immunity would not apply.

## II.

▮▮ Having determined the defense of official immunity is available to defendants, we must next decide whether the lower courts correctly denied their motion for summary judgment. Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Minn. R.Civ.P. 56.01. On a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. *Hansen v. City of St. Paul*, 298 Minn. 205, 206, 214 N.W.2d 346, 347 (1974). If any doubt exists as to the existence of a material fact, the doubt must be resolved in favor of finding that a fact issue exists. *Rathbun v. W.T. Grant Co.*, 300 Minn. 223, 229, 219 N.W.2d 641, 646 (1974).

Defendants are entitled to summary judgment on the basis of official immunity if there are no genuine issues of material fact tending to show defendants' felony stop of the Agunbiades constituted a willful or malicious violation of the Agunbiades' rights under Minn.Stat. § 363.03, subd. 4. In determining whether an official has committed a malicious wrong, we consider whether the

---

7. Section 363.071, subdivision 2 provides in relevant part:

> In any case where a political subdivision is a respondent, the total of punitive damages awarded an aggrieved party may not exceed $8,500 and in that case if there are two or more respondents the punitive damages may be apportioned among them. Punitive damages may only be assessed against a political subdivision in its capacity as a corporate entity and no regular or ex officio member of a governing body of a political subdivision shall be personally liable for payment of punitive damages pursuant to this subdivision.

official has intentionally committed an act that he or she had reason to believe is prohibited. *Rico v. State*, 472 N.W.2d at 107–08. Minn.Stat. § 363.03, subd. 4, provides that it is unlawful "[t]o discriminate against any person in the access to, admission to, full utilization of or benefit from any public service because of race [or] color * * *." It is undisputed that defendants were providing a public service within the meaning of Minn. Stat. § 363.03, subd. 4. *City of Minneapolis v. Richardson*, 307 Minn. 80, 86, 239 N.W.2d 197, 201 (1976). At issue is whether, pursuant to the standard we articulated in *Richardson*, a reasonable fact finder could conclude that defendants' treatment of the Agunbiades was "so at variance with what would reasonably be anticipated, absent [racial] discrimination that [racial] discrimination is the probable explanation," 307 Minn. at 87, 239 N.W.2d at 202.[8]

In applying the *Richardson* standard, the totality of the circumstances surrounding the alleged discriminatory conduct must be examined. In the context of a felony stop, the considerations must include (1) whether there was a reasonable basis for suspecting the citizens stopped to have been engaged in criminal activity, (2) whether the length of the stop was unnecessarily long, and (3) whether any evidence tends to show defendants acted in bad faith or with malicious intent.

We address first whether a reasonable fact finder could conclude that the officers lacked a reasonable basis for suspecting the Agunbiades to have been engaged in criminal activity. The department alleges that defendants lacked a particularized and objective basis for stopping the Agunbiades and stopped them solely on account of their race. It is well-established that an investigatory stop may be based in part on a description of a suspect's race, but race or color alone is not a sufficient basis for making an investigatory stop. *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir.1982), *cert. denied* 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983).[9] Here defendants argue that they relied on a number of factors other than race in deciding to stop the Agunbiades. In particular, defendants assert that the decision to stop the Agunbiades was based on the following factors: (1) The suspect was described as male and the passenger in the suspect vehicle was male; (2) The suspect vehicle reached the intersection of Highway 10 and County Road I at a time in which a vehicle leaving the crime scene would have reached this intersection; (3) The suspect vehicle turned southbound onto Highway 10, a possible escape route; (4) The suspect was described as wearing dark clothing and the passenger in the suspect vehicle appeared to wear dark clothing; (5) The suspect was described as having short hair and the passenger in the suspect vehicle had short hair; (6) The suspect vehicle was weaving in and

8. In this context, we believe that if a reasonable fact finder could determine that defendants have engaged in racial discrimination under the *Richardson* standard, then a reasonable fact finder could also conclude that defendants acted maliciously under the *Rico* standard (i.e. intentionally committed an act that he or she had reason to believe is prohibited).

9. The Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) established the constitutionality of what has come to be known or an investigatory, or *Terry* stop. Such stops are constitutionally permissible when officers are aware of specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrants that the person stopped has been, or is about to be engaged in criminal activity. *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981). We note that a determination that claimants under Minn.Stat.

§ 363.03, subd. 4, have been discriminated against in connection with an investigatory stop is distinguishable from a determination that the investigatory stop itself constitutes an unreasonable seizure under *Terry*. An investigatory stop might be constitutionally permissible, and because of further circumstances might be discriminatory under the standards of the Human Rights Act. We will not allow compliance with the Fourth Amendment to be used as a pretext for the malicious harassment of minorities. Of course, where officers have a reasonable basis for making an investigatory stop under well-established Fourth Amendment standards, this weighs in favor of finding that racial discrimination was not the probable explanation for the stop. Where an investigatory stop is constitutionally permissible, a claimant alleging discrimination needs to produce facts beyond a merely mistaken but lawful seizure to establish a prima facie case of discrimination.

out of traffic and traveling faster than the flow of traffic; (7) The passenger in the suspect vehicle moved between the seats and looked back at the police car.

The department disputes the presence of many of the factors purportedly relied upon by defendants. Viewing the evidence in the light most favorable to the nonmoving party on defendants' motion for summary judgment, a reasonable fact finder could conclude that Lateesa Agunbiade was not speeding or making improper lane changes, and that Adewale Agunbiade did not look into the rear seat of the vehicle until he heard the police siren. Moreover, a reasonable fact finder could conclude that the officers were unaware the suspect had short hair and had fled the crime scene in an automobile.

Viewing the evidence in the light most favorable to the nonmoving party, defendants had a sufficient, albeit tenuous, basis for initially stopping the Agunbiades vehicle under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), because the suspect vehicle was moving in a direction away from the crime scene shortly after commission of an armed robbery and the suspect's dark clothing and race matched the description of the suspect. That said, however, we are unable to conclude in the absence of further fact finding that the basis for initially stopping the vehicle was strong enough to preclude any possibility of discrimination under the Human Rights Act. An investigatory stop may be constitutionally permissible and yet be discriminatory under the standards of the Human Rights Act. *See* note 9, *supra.*

Having addressed the officers' decision to initially stop the Agunbiades' vehicle, we next consider whether discrimination might be inferred from the duration of the stop. A detention after a stop must be reasonable in scope and duration. *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983) (plurality opinion). The Agunbiades were stopped for a period of about 15 minutes. Defendants had no reason to believe that the suspect was a 13–year–old boy or that he had a woman as an accomplice. Moreover, the police dispatch stated the suspect was wearing black clothing including a shiny black shirt. There is no

evidence that Adewale Agunbiade was wearing a shiny black shirt or any other black clothing. Rather, there is evidence that he had on a dark navy blue sweater. Construing this evidence in the light most favorable the nonmoving party, we believe a reasonable fact finder could determine that the length of detention was unreasonable and was the product of racial discrimination.

We finally note that the department has produced evidence tending to show defendants acted in bad faith. Deposition evidence indicates that the Agunbiades were told by defendants after being stopped that they had been stopped because defendants were looking for a gray car when, in fact, no vehicle description had been broadcast.

In conclusion, when factual disputes are resolved favorably to plaintiffs, the basis for initially stopping the Agunbiades was tenuous but met constitutional standards. The length of the stop may have been unreasonable, however, given that Adewale Agunbiade's age and clothing failed to correspond with the description of the suspect in the original dispatch and given the apparent absence of any other evidence tending to link the Agunbiades to the crime. In addition, defendants' false statement to the Agunbiades that they had been stopped because their vehicle matched a description received by defendants may be evidence of bad faith.

Under the totality of the circumstances surrounding defendants felony stop of the Agunbiades, we conclude that a reasonable fact finder could find that defendants maliciously discriminated against the Agunbiades in violation of Minn.Stat. § 363.03, subd. 4 by treating the Agunbiades in a manner so at variance with what would reasonably be anticipated absent discrimination, that discrimination is the probable explanation. We affirm the court of appeal's denial of summary judgment and remand the matter to the administrative law judge.

SIMONETT, Justice (concurring specially).

I agree the Human Rights Act does not preclude application of official immunity and I agree the issue of "malice" survives the

respondent officers' motion for summary judgment. I wish to comment, however, on an aspect of summary judgment motion practice.

It seems to me only when the evidence preponderates heavily in favor of the moving party must (or should) the appellate or trial court view the evidence in the light most favorable to the nonmoving party; because only then is the "in the light most favorable" test needed to ascertain if there is a genuine issue of material fact.

If the facts are plainly in dispute on a genuine issue, there is no need, in order to deny summary judgment, to consider how the evidence might be interpreted to "favor" one party over another. To discuss "favorableness" in this situation runs the risk of being misconstrued as factfinding.

In this case, the respondent officers claim their stop of complainant's vehicle was a constitutional *Terry* stop, where race may be a proper consideration. The majority opinion points out this claim does not necessarily absolve the officers of a racial discrimination charge because there are still material facts in dispute on the issue of "malice" and on the issue of racial discrimination. The majority opinion further points out the proof on these two issues may overlap. These observations are appropriate. But at this stage of the proceedings, to avoid putting a thumb on the scales, I would say little more, except that because there are genuine issues of material fact the case goes to a full hearing before an administrative law judge who is the factfinder.

COYNE, Justice (concurring specially).

I join in Justice Simonett's special concurrence.

WAHL, Justice (concurring in part, dissenting in part).

I concur with the holding of the majority opinion that the petitioners' motion for summary judgment was properly denied and that the matter must be remanded for further proceedings but I respectfully dissent from the holding that the defense of official immunity may be asserted in an action brought under the public service provision of the Minnesota Human Rights Act, Minn.Stat. § 363.03, subd. 4 (1990).

Official immunity is a common law doctrine applicable to state tort actions. Under its protection, "a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn.1988). The Minnesota Human Rights Act, creating a statutory cause of action, has no basis in the common law and there is no common law right protecting a police officer from a legislatively authorized claim of race discrimination in public services. Had the legislature seen fit to provide that protection, it would have incorporated common law immunity into the Human Rights Act as it has done in other statutes. *See, e.g.,* Minn.Stat. § 125.09, subd. 5 (1992) (school board members acting in good faith and with due care are immune for official actions under this section); Minn.Stat. § 626.556, subd. 4(b) (1992) (social workers immune from any civil or criminal liability resulting from the person's actions reporting the maltreatment of a minor if person is acting in good faith). The extent to which the legislature intended to provide immunity within the provisions of the Human Rights Act, however, appears to be its limitation of the personal liability for punitive damages of members of a governing body of a political subdivision. Minn.Stat. § 363.071, subd. 2. As the court of appeals notes, "[t]he specific integration of statutory immunities that parallel, rather than alter, the contours of common law official immunity * * * emphasizes that official immunity is not implicit in all statutory enactments." 498 N.W.2d 503, 506 (Minn.App.1993).

Even under the analysis of the majority opinion, however, official immunity should not be asserted in an action brought under the Human Rights Act. The majority opinion relies on the presumption that statutory enactments are consistent with common law doctrines unless the statute abrogates the common law by express wording or necessary implication. As the majority opinion notes, nothing in the Human Rights Act ex-

pressly disallows official immunity as a defense to a claim brought under the Act. I disagree, however, with the conclusion that the Act does not abrogate the doctrine of official immunity by necessary implication.

To establish a claim of discrimination under Minn.Stat. § 363.03, subd. 4 the record must establish:

> (1) an adverse difference in treatment with respect to public services of one or more persons when compared to the treatment accorded others similarly situated except for the existence of an impermissible factor such as race, color * * *; or (2) treatment so at variance with what would reasonably be anticipated absent discrimination that discrimination is the probable explanation.

*City of Minneapolis v. Richardson,* 307 Minn. 80, 87, 239 N.W.2d 197, 202 (1976).

The majority opinion recognizes that the "manifest purpose of section 363.03, subdivision 4 of the Human Rights Act is to eradicate discrimination in the provision of public services, including the provision of law enforcement services," but concludes that official immunity will not undermine this remedial purpose because police officers will not be protected from willful or malicious misconduct. Thus, "official immunity would only bar discrimination claims brought under Minn.Stat. § 363.03, subd. 4 where there was no showing of willfulness or malice." Op. at 570.

This conclusion inappropriately equates the standard for proving racial discrimination under the Human Rights Act with the "willful and malicious" standard necessary to avoid application of official immunity. These standards are not the same. Nothing in the Human Rights Act requires a plaintiff to prove discriminatory intent on the part of the defendant. By permitting the defendant to assert a defense of official immunity, the majority opinion grafts an intent requirement onto the Act.

Contrary to the claim of the majority opinion that "there are few circumstances where a public official might be deemed to have committed a discriminatory act under Minn. Stat. § 363.03, subd. 4, and yet be deemed not to have committed a malicious or willful wrong under the principally objective standard set forth in *Rico*," a large part of the behavior that produces racial discrimination is influenced by unconscious racism. *See* Charles R. Lawrence III, *The Id, the Ego, and Equal Protection: Reckoning with Unconscious Racism,* 39 Stan.L.Rev. 317 (1987) [hereinafter *Unconscious Racism*]. Although it often may be appropriate for the legal system to disregard the influence of the unconscious on individual or collective behavior, where the controversy centers on a statute designed to eradicate racial discrimination, the law must recognize that this goal will only be achieved when all sources of racially discriminatory behavior are identified and addressed.[1]

To add a motive-centered intent requirement creates an imaginary world where discrimination does not exist unless it is intended. The injury of racial discrimination exists irrespective of the defendant's motives and it is no less injurious or reprehensible when it originates in the unconscious. Since improper motives are easy to hide, the majority opinion gives those the statute was designed to protect a heavy burden of persuasion and severely limits the number of cases in which

---

1. Professor Lawrence proposes a "cultural meaning" test, to trigger judicial recognition of race-based behavior. He suggests courts look at the cultural meaning of an allegedly racially discriminatory act as the best analogue for, and evidence of, a collective unconscious that cannot be observed directly. Thus, where a particular act sends a symbolic message to which our culture attaches racial significance, courts could find evidence of racial discrimination. *Unconscious Racism,* at 355–62.

As Professor Lawrence notes, courts frequently interpret the meaning of social phenomena. For example, in Establishment Clause cases, courts determine whether a government practice advances or inhibits religion by inquiring into the meaning the culture gives that practice; in determining the scope of the "zones of privacy" protected by Due Process Clause of the Fourteenth Amendment, courts interpret the concept of the family by referring to the meaning that the history and traditions of our culture have given it; and in Fourth Amendment cases, courts define the scope of protection from unreasonable searches and seizures by asking whether a person has a "reasonable expectation of privacy" in the searched premises. *Id.,* at 359.

courts will acknowledge and remedy racial discrimination.

I would affirm the decision of the court of appeals and hold that official immunity does not apply to discrimination claims under the Minnesota Human Rights Act.

GARDEBRING, J.  I join in Justice Wahl's dissent in part.

PAGE, J.  I join in Justice Wahl's concurrence in part and dissent in part.

PAGE, Justice (dissenting).

I write to comment on the court's determination that stopping the Agunbiades did not violate the standard set out in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

As the court notes at footnote 9, *Terry* permits an officer to make an investigatory stop only when the officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." 392 U.S. at 21, 88 S.Ct. at 1880.  Nothing contained in *Terry* permits discriminatory stops.

Appellants list seven factors, in addition to race, which "reasonably warranted" the officers' stop of the Agunbiades in connection with the robbery.  The court, in concluding that there was a reasonable basis for the stop of the Agunbiades' vehicle, relies on two of these factors, in addition to race.  In my view, these factors, taken either individually or in combination, did not reasonably warrant the stop.

1) "The suspect was described as male and the passenger in the vehicle was male." Gender alone is no reason to believe a person has been involved in a crime.  Additionally, here the suspect was a lone male, yet the stop was of an adult female and a thirteen-year-old male.

2) "The suspect vehicle reached the intersection of Highway 10 and County Road I at a time in which a vehicle leaving the crime scene would have reached this intersection." The speed of a vehicle, given the time elapsed, would determine how far a vehicle would be from the crime scene, assuming it was continuously in motion, and assuming it took a direct route.  Further, if a vehicle was involved, it could not be known how long it would have taken the suspect to reach the vehicle in order to flee from the area of the robbery.  Given the number of possible variables involved, an officer could scarcely predict that a vehicle used in the robbery would be at place X at exactly Y minutes after the robbery.  Thus, the location of the vehicle alone does not "reasonably warrant" the stop.

3) "The suspect vehicle turned southbound onto Highway 10, a possible escape route." Any route away from the robbery scene was a possible escape route.  This factor, therefore, does not create an individualized, articulable suspicion.

4) "The suspect was described as wearing dark clothing and the passenger in the suspect vehicle appeared to wear dark clothing." The communication the officers received actually stated "BLACK CLOTHING, SHIRT WAS A SHINY BLACK."  It is not disputed that Adewale Agunbiade was wearing a navy blue sweater.  The officers obviously could not have seen him wearing a "shiny black" shirt and so this factor cannot play any role in justifying the stop.

5) "The suspect was described as having short hair and the passenger in the suspect vehicle had short hair."  Many African American males have short hair, as do some African American females.  Short hair is not, in itself, suspicious.

6) "The suspect vehicle was weaving in and out of traffic and traveling faster than the flow of traffic."  This factor may well have been the basis for making a traffic stop.  It is also, however, the way many Twin Cities commuters drive.  Unless the officers were in hot pursuit, this method of driving does not imply the occupants of the car were armed robbers.

7) "The passenger in the suspect vehicle moved between the seats and looked back at the police car."  This factor approaches the ridiculous.  The reasons why a passenger in a car might look back at a following police car are too numerous to contemplate.

Even when these reasons are combined with the fact of the Agunbiades' race, stopping them on suspicion of committing the robbery was still not reasonably warranted. These factors, with the exception of factor 6 which would have warranted a traffic stop, would lead to stopping any African American male who happened to be in the vicinity of the crime. Indeed, counsel for the City confirmed that point at oral argument. I understand the term "reasonably warrant" to require more than some slight possibility that the person stopped may have committed, or is about to commit, a crime. To warrant a *Terry* stop, factors have to *suggest* the person stopped is involved in criminal activity. They do not do so here. The court's analysis implies the factors must **actually** negate any possible involvement in criminal activity before a *Terry* stop is unwarranted.

The court's opinion does not list the most important factor leading to this investigative stop—the fact that most people in Mounds View are white. The Agunbiades were stopped because their race differed from the race which predominates in Mounds View. That most people in Mounds View are white certainly did not give the police a basis for an individualized, articulable suspicion that the Agunbiades were involved in the robbery. This case raises the specter of the police being permitted to stop innocent individuals solely because they happen to be someplace they do not "belong." The court's opinion suggests such stops are simply one of the hazards people who belong to an identifiable minority must be willing to accept. It is unimaginable that a white mother driving her thirteen-year-old son to school would have been stopped had the suspect been a white male.

As the Supreme Court said in *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975), reasonableness depends on "a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." Here, there is nothing to balance—the public simply has no interest in stopping every person of color within range of a place where a person of color is alleged to have committed a crime.