# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1377

_____

Shenita Craighead and Sherell     *
Craighead, as Co-Trustees for     *
the Heirs and Next-of-Kin of     *
Charles Craighead, Deceased,     *
    *
         Appellees,     *
    *
      v.     *    Appeal from the United States
    *    District Court for the District
Michael A. Lee and the City of     *    of Minnesota.
St. Paul,     *
    *
         Appellants.     *

_____

Submitted: November 19, 2004
Filed: January 10, 2005 **(Corrected 3/1/05)**

_____

Before WOLLMAN and HEANEY, Circuit Judges, and HOLMES,[1] District Judge.

_____

HOLMES, District Judge.

Carlos Scott shot two men in less than two hours on the morning of December 3, 2001. After doing so, he pulled his gun on Charles Craighead, but

_____

[1]The Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas, sitting by designation.

Craighead wrestled the gun away from him. Craighead and Scott were still wrestling when Officer Michael Lee arrived shortly after Craighead had taken the gun from Scott. Lee's shotgun blast killed Craighead and wounded Scott.

Craighead's heirs and next of kin brought this action against Lee individually and against the City of St. Paul, asserting claims under 42 U.S.C. § 1983, the Minnesota Wrongful Death Act (Minn. Stat. § 573.02), and the common law of Minnesota. Lee and the City of St. Paul moved for summary judgment based on qualified immunity as to the Section 1983 claims and based on official immunity as to the state-law claims. Craighead's heirs and next of kin conceded their Section 1983 claims against the City of St. Paul, which left the claim against Lee individually as the only count premised on federal law. The district court[2] denied the motion for summary judgment. Lee and the City of St. Paul appeal that ruling. We affirm.

## I.

The facts are undisputed as to the events that preceded Lee's arrival on the scene where Craighead and Scott were wrestling over the gun.

On the morning of December 3, 2001, while driving a borrowed vehicle, Scott shot Arcell Magee in a drive-by shooting. The St. Paul police dispatcher alerted the patrolmen on duty through the St. Paul police communications system at 09:10:18. The only description of the gunman was that he was a black male. Scott abandoned the borrowed vehicle, obtained a ride to the house of Shon Pierson, met Pierson on the sidewalk, chased him down, and shot him in the head. That shooting was reported by the dispatcher in three different announcements between 10:18:55 and 10:19:50.

[2]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

Scott fled on foot.  Over the next four minutes, the dispatcher reported sightings of a black male running in the area.  Scott went to the vicinity of Marshall and Oxford, where he twice attempted to hijack a car.  The first man begged, "Don't do this to me," and Scott left him.  Scott then saw Charles Craighead next to a car and approached him. Craighead had just left the house of Meredith Price after negotiating a contract to paint her house.  He was accompanied by Joyce McDougle.  Scott attempted to force Craighead to give him a ride.  Craighead grabbed Scott, and the two men started wrestling.  Craighead, like Scott, was a black male.

Price called 911 at 10:23:15 and said, "I need police at 217 Oxford.  A guy's pulling a gun, there's going to be a shooting here."  Price continued to talk to the 911 operator as events transpired.  At 10:23:43, the dispatcher broadcast, "Squads, we got a black male with a gun at 217 North Oxford across from Central High School.  We have somebody on the phone reporting this.  Unknown if it's one or two parties with guns."  As the two men struggled, a shot was fired.  At 10:24:08, the dispatcher told all squads, "one shot fired," and she followed up at 10:24:18 with the location: "Oxford and Marshall."

The wrestling took the two men across the street toward a dumpster.  As they were wrestling, Craighead took the gun away from Scott.

Lee was in the vicinity, and he started driving toward North Oxford across from Central High School.  Lee thought that the gunman could be the one who was responsible for the two shootings earlier that morning.  He removed the shotgun issued by the St. Paul Police Department from its overhead rack and chambered one round. Driving south on Oxford, Lee crossed Marshall where he saw McDougle.  He then drove further until he came to the dumpster where the two men were wrestling.  Lee exited his squad car with his shotgun in hand.

From the time that Lee exited the squad car with his shotgun in hand, the testimony diverges.  At 10:24:18, the dispatcher broadcast a report: "Received.  One of the men, the males, took a gun away from another male and we have it at two nine seventeen North Oxford, across from Central."  Lee testified that he had already exited the squad car when that report was broadcast.  Craighead's heirs argue that the timing of the events makes it likely that Lee was still in the squad car when the dispatcher broadcast the news that the gun had changed hands.  Lee also testified that when he exited the car he did not turn on his portable communications unit known as a "pack set," so he did not hear the news that the gun had changed hands.  Craighead's heirs note that Lee testified that he customarily maintained radio contact when not in his car through his "pack set" and that he would turn his pack set on by reflex when he exited the car.  Another officer testified that Lee's habit is common practice among St. Paul police officers.

When Lee exited the squad car, his focus was on the man with the gun – Craighead.  Lee testified that he yelled at the top of his voice several times, drop the gun, drop the gun, drop the gun.  Lee says that Craighead responded, looked at him, and placed the gun on the top of an object in the dumpster.  Because the gun was still in reach, Lee continued to yell at Craighead to drop the gun, drop the gun.  A moment later, according to Lee, Craighead reached back in the dumpster and grabbed the gun, pointed the gun toward Scott, and then pointed it back toward Lee.  Lee says that, when Craighead pointed the gun back toward him, he hit the safety on his shotgun, aimed at Craighead, and fired.  Craighead and Scott were still wrestling when Lee fired.  Lee was approximately 30 feet from them.  The shot hit both men.  Scott fell immediately, but Craighead did not, which made Lee think he had missed Craighead.  He yelled at Craighead, get down, get down, and then Craighead went down.  The 911 operator reported at 10:24:28, "Says the police shot the wrong guy."  Lee reported at 10:24:29, "Shots fired!  One down!"

Lee estimated that ten seconds passed between his exiting the squad car and firing the shotgun. Assuming that he fired before 10:24:28 – when the dispatcher reported, "Says the police shot the wrong guy" – on Lee's account he would have been outside his car when the dispatcher broadcast the report at 10:24:18 that the gun had changed hands.

The testimony of Price and McDougle conflicts with Lee's. Price and McDougle testified that Craighead held the gun over his head pointed upward throughout his struggle with Scott. Craighead was substantially taller than Scott and was holding the gun out of Scott's reach as an older child would hold an object out of the reach of a younger child who was trying to take it from him. Price and McDougle testified that Craighead never pointed the gun toward Lee. They testified that Lee did not tell Craighead to put the gun down. They testified that Lee gave no warnings and no commands. They testified that Craighead never put the gun on an object in the dumpster. McDougle estimated that seven or eight seconds passed between the time Lee exited his car and the time he fired his shotgun. Price testified, "[Lee] arrived, got out of the car, and shot him. It was pretty much that quick." She estimated that three seconds passed between the time Lee exited the squad car and fired his shotgun. "It all happened very, very quickly."

If Lee fired the shot six seconds or less before 10:24:28 when the 911 operator reported, "Says the police shot the wrong guy," and if Lee took only three seconds from exiting the car until firing the shot, he would have been in his car when the dispatcher reported that the gun had changed hands.

Another officer, Rob Stanway, followed Lee to the scene at a distance of three or four car lengths. Stanway saw the men wrestling, saw the gun, and started to open his door and take cover behind it so that he would not be exposed to pistol fire, but he heard the blast of Lee's shotgun before he could get out. He did not see Lee fire.

Both sides submitted expert witness reports. Defendants' experts say that Lee's actions were objectively reasonable. Plaintiffs' experts say that they were not. Plaintiffs' experts say that, at the distance of some 30 feet, under the circumstances with the two men grappling, a trained shooter would have known that the shot would probably hit both men. One of plaintiffs' experts opined, "The shooter elected to shoot both the suspect and his victim, whomever either might be, without any discrimination whatsoever for who was going to be seriously injured and/or killed[.]" Another of plaintiffs' experts opined, "Officer Lee consciously chose to discharge his firearm at both men, reasonably knowing that one of them was not the suspect and was not involved in any criminal activity."

## II.

In deciding a motion for summary judgment, a district court must view the facts and inferences in the light most favorable to the party opposing summary judgment. *Boerner v. Brown & Williamson Tobacco Corp.*, 260 F.3d 837, 841 (8th Cir. 2001). The district court did so here. Thus, the district court accepted plaintiffs' version of the facts according to which Craighead held the gun over his head, pointed upward, throughout his struggle with Scott; Lee knew that only one black male was suspected in the earlier crimes; Lee knew that one of the two men before him was most likely a victim; and Lee exited his squad car and fired his shotgun within three seconds, without issuing any warnings or commands, under circumstances in which a trained shooter would have known that the shot would hit both men.

Because this is an interlocutory appeal from the denial of qualified immunity, our review is limited to the legal question of whether Lee and the City of St. Paul are entitled to immunity. We have jurisdiction to review whether an official is entitled to immunity to the extent the question turns on an issue of law, but we may not review a district court's conclusion that the pretrial record presents a sufficient factual dispute requiring a trial. *Hawkins v. Holloway*, 316 F.3d 777, 781 (8th Cir. 2003). Thus, we must accept the summary judgment facts as described by the district court

because evidentiary determinations are not presently appealable. *Moran v. Clarke*, 359 F.3d 1058, 1060 (8th Cir. 2004). We will affirm the denial of summary judgment on the issue of qualified immunity if a genuine issue of material fact exists as to whether a reasonable officer could have believed his actions to be lawful. *Wilson v. City of Des Moines*, 293 F.3d 447, 449 (8th Cir. 2002).

## III.

In a suit against an officer for an alleged violation of a constitutional right, the elements of qualified immunity must be considered in proper sequence. The first question is, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed. 2d 272 (2001). If the facts, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, the second question is whether the right was clearly established. *Id*. at 202, 121 S. Ct. at 2156.

Since this case presents an issue of whether an officer used excessive force, the case must be analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Conner*, 490 U.S. 386, 388, 109 S. Ct. 1865, 1867-68, 104 L. Ed. 2d 443 (1989). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397, 109 S. Ct. at 1872. Apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 1699, 85 L. Ed. 2d 1 (1985). Notwithstanding probable cause to seize a suspect, an officer may not always do so by killing him. *Id*. at 9, 105 S. Ct. at 1700. "The intrusiveness of a seizure by means of deadly force is unmatched." *Id*. Hence, "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Id*. at 11, 105 S. Ct. at 1701. "Thus, if the suspect threatens the

-7-

officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id*. at 11-12, 105 S. Ct. at 1701.

As to the first question that *Saucier* requires us to address, we have no hesitancy in saying that the facts alleged, taken in the light most favorable to Craighead's heirs and next of kin, show that Lee's use of deadly force was objectively unreasonable.[3] The evidence most favorable to Craighead's heirs and next of kin shows that Lee in a continuous sequence exited the squad car, aimed his shotgun at the two men wrestling, and fired without warning, within approximately three seconds, while Craighead was holding the gun overhead, pointed upward. A trained shooter, such as Lee, would have known that under the circumstances the shot would hit both men, including the one man that Lee had to presume was a victim rather than a suspect. Furthermore, the facts, taken in the light most favorable to Craighead's heirs and next of kin, show that Lee either was still in his car or had his pack set on when the dispatcher broadcast the news that the gun had changed hands. It would be objectively unreasonable for a police officer to fire a shotgun under such circumstances.

The more difficult question is the second one that *Saucier* commands us to address, *i.e.*, whether the right was clearly established. A right is clearly established when that right is so clear that a reasonable official would understand that what he is

---

[3]We emphasize that we are bound in this interlocutory appeal to accept the facts found by the district judge, who in turn was required to view the facts in the light most favorable to the party opposing summary judgment. At trial, the finder of fact may disbelieve any or all of the facts assumed in this opinion and may credit Lee's testimony and that of his experts against the evidence offered by plaintiffs.

doing violates that right. *Saucier*, 533 U.S. at 202, 121 S. Ct. at 2156. Although the first question is one of objective reasonableness and the second question is also one of reasonableness, the Supreme Court emphasized in *Saucier* that the two questions are not duplicative and must be addressed separately. The key distinction between the two questions is that the right allegedly violated must be defined at the appropriate level of specificity before a court can determine whether it was clearly established. *Id.* *See also Brosseau v. Haugen,* 543 U.S. ___, 125 S. Ct. 596, 599-600, 160 L. Ed. 2d ___ (2004); *Wilson v. Layne*, 526 U.S. 603, 615, 119 S. Ct. 1692, 1700, 143 L. Ed. 2d 818 (1999).

Neither party has cited a case with facts substantially similar to those we are required to assume on this appeal, nor have we found one. Nonetheless, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516, 153 L. Ed. 2d 666 (2002). "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Id.* Hence, the issue is not whether prior cases present facts substantially similar to the present case but whether prior cases would have put a reasonable officer on notice that the use of deadly force in these circumstances would violate Craighead's right not to be seized by the use of excessive force. At least since *Garner* was decided nearly 20 years ago, officers have been on notice that they may not use deadly force unless the suspect poses a significant threat of death or serious physical injury to the officer or others. On the facts we are required to assume, Craighead did not pose a significant threat of death or serious physical injury to Lee at the time Lee fired the shotgun because the pistol was continuously over Craighead's head, pointed upward, as Craighead was keeping it from the smaller Scott. Even if Lee thought that Craighead posed a significant threat of death or serious physical injury to Scott, the facts we are required to assume show that Lee fired the shotgun in circumstances in which he knew or should have known that he would hit both Craighead and Scott, so he cannot have fired the shot

to protect Scott. Nor does Lee claim that he fired to protect Scott. The facts we are required to assume show that a warning was feasible but not given. Moreover, Craighead was grappling with Scott; he was not fleeing when Lee fired the shot.[4]

Before December 3, 2001, this Court had denied qualified immunity in at least four cases in which the plaintiff presented evidence to show that the officer used deadly force under circumstances in which the officer should have known that the person did not present an immediate threat of serious physical injury or death. *Ribbey v. Cox*, 222 F.3d 1040 (8th Cir. 2000); *McCaslin v. Wilkins*, 183 F.3d 775 (8th Cir. 1999); *Woolfolk v. Smith*, 81 F.3d 741 (8th Cir. 1996); *Ludwig v. Anderson*, 54 F.3d 465 (8th Cir. 1995). In addition, in *Gardner v. Buerger*, 82 F.3d 248 (8th Cir. 1996), this Court reversed a judgment as a matter of law in favor of an officer because a jury could reasonably have believed that the officer used deadly force against a person who did not pose an immediate threat of serious physical injury or death to him. Those cases, along with *Garner*, put officers on notice before December 3, 2001, that they may not use deadly force under circumstances in which they should know that the suspect does not present an immediate threat of serious physical injury or harm. Craighead's right not to be seized by deadly force was clearly established with sufficient specificity to meet the second prong of *Saucier*.

In *Wilson v. City of Des Moines*, 293 F.3d 447 (8th Cir. 2002), which was decided seven months after December 3, 2001, this Court affirmed denial of summary judgment on qualified immunity where the plaintiff presented evidence to show that deadly force was used in 1999 against a person who did not pose an immediate threat of serious physical injury or death to the officer. In each of these six cases – *Ribbey*,

---

[4]Unlike *Brosseau*, which the Supreme Court decided on December 13, 2004, the facts we must assume show that Lee gave no commands and made no attempt to use less-than-deadly force; nor, as mentioned, was Craighead fleeing when Lee fired.

*McCaslin*, *Gardner*, *Woolfolk*, *Ludwig*, and *Wilson* – the officer presented evidence to show that the person against whom deadly force was used had posed a significant threat of death or serious physical harm. Nevertheless, in each case, this Court held that a genuine issue of material fact precluded entry of summary judgment as a matter of law in favor of the officer. *See also Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756 (2nd Cir. 2003); *Carr v. Castle*, 337 F.3d 1221 (10th Cir. 2003); *Curley v. Klem*, 298 F.3d 271 (3rd Cir. 2002); *Clem v. Corbeau*, 284 F.3d 543 (4th Cir. 2002). *Wilson* held that summary judgment on qualified immunity was inappropriate because "[t]he current record does not conclusively establish the reasonableness of the officers' actions or beliefs." *Wilson*, 293 F.3d at 454. Likewise, the record here does not conclusively establish the reasonableness of the officer's actions. Therefore, the district court correctly held that summary judgment on the basis of qualified immunity is inappropriate.

**IV.**

The district court also denied Lee and the City of St. Paul's motion for summary judgment based on official immunity as to the state-law claims. Under Minnesota law, the decision to use deadly force is a discretionary decision entitling a police officer to official immunity absent a willful or malicious wrong. *Maras v. City of Brainerd*, 502 N.W.2d 69, 77 (Minn. 1993). Official immunity also protects government entities from vicarious liability for actions that are entitled to immunity. *Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 316 (Minn. 1998). In determining whether an official committed a willful or malicious wrong, the court considers whether the official has intentionally committed an act that he had reason to believe is prohibited. *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571-72 (Minn. 1994). Whether or not an officer acted willfully or maliciously is usually a question of fact to be resolved by the jury. *Maras*, 502 N.W.2d at 77. The reasoning that led us to affirm the denial of qualified immunity as to plaintiffs' Section 1983 claims leads us to affirm the denial of official immunity as to the state-law claims.

## V.

The ultimate outcome of this case may well depend on whose testimony the finder of fact believes.  This is a classic example of a case that should be decided by trial rather than by summary judgment.  Therefore, we affirm.

_____