Wendelyn Sue **REUTER**, et al.,
Respondents,

v.

**CITY OF NEW HOPE**, Defendant,

Roxanne **Erickson**, et al., **Appellants.**

No. C0–89–1337.

Court of Appeals of Minnesota.

Jan. 2, 1990.

Review Denied Feb. 28, 1990.

Jeffrey S. Ronbeck, Minneapolis, for respondents.

Carol A. Kubic, Pustorino, Pederson, Tilton & Parrington, Minneapolis, for appellants.

Heard, considered and decided by FOLEY, P.J., and KALITOWSKI and STONE *, JJ.

## OPINION

KALITOWSKI, Judge.

Officers Roxanne Erickson and Lowell Campbell appeal from a denial of their summary judgment motion claiming qualified immunity and official immunity from

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

civil suit arising out of an emergency medical admission.

## FACTS

On November 11, 1985, Wendelyn Reuter drove her husband David Reuter to perform a reupholstering bid at a home in New Hope, Minnesota. The couple's two daughters were with them. Wendelyn Reuter parked the family's Toyota sedan in front of the home where David Reuter was performing the reupholstering bid. David went inside and left Wendelyn Reuter and the two girls in the car.

At approximately 7:30 p.m., appellant Roxanne Erickson, a police officer for the City of New Hope, responded to a report of a suspicious vehicle parked in a residential cul-de-sac in the City of New Hope. As Erickson approached the cul-de-sac for the address given in the report, she spotted the Reuter vehicle and parked her marked squad car behind it. She then approached Mrs. Reuter and her two children.

Erickson was wearing a blue police jacket with the New Hope police insignia on the left shoulder, a U.S. flag on the right shoulder and a gold police badge on the left pocket.

Erickson tapped on the driver's side window and asked Mrs. Reuter to roll down her window. Reuter responded by locking both car doors and turning away from Erickson. Erickson then repeatedly asked Reuter to roll down her window and identify herself. Reuter responded only by saying, "Just leave me alone."

One of the girls then attempted to unlock the car door. Officer Erickson testified that she saw Reuter slap the girl and push her away from the door and into the back seat. Reuter, on the other hand, claims she was only "helping" her daughter into the back seat. Erickson believed there might be a possible problem and returned to her squad car to request a back-up for assistance.

Erickson then returned to the Reuter vehicle to try again to talk to Mrs. Reuter. Mrs. Reuter said, "Don't bother me. My husband is in that house, go talk to him."

One of the girls pointed to a house north of where the Reuter car was parked.

Appellant Lowell Campbell, a New Hope police sergeant, had heard the original suspicious vehicle call and was already en route to the scene when he received Erickson's request for assistance. As Campbell pulled into the cul-de-sac, Reuter started her car and attempted to drive away. Campbell then parked his car in front of Reuter's car to block her exit. Like Erickson, Campbell was driving a marked City of New Hope squad car and was wearing a dark blue police jacket with New Hope police insignia on the left shoulder, U.S. flag on the right shoulder and gold badge on his left pocket. Campbell was also wearing a police hat with a gold badge on the front.

After Officer Campbell parked his squad car in front of the Reuter vehicle, he got out of his car and approached Officer Erickson. Erickson stated, "I don't know what we've got here. She won't identify herself." Campbell then approached Mrs. Reuter and tapped on her windows. He asked her to roll down the window, identify herself and explain what she was doing. Reuter ignored him.

After Reuter refused to respond, Officer Campbell threatened to arrest Reuter for disorderly conduct. Campbell claims he was trying to draw Reuter's attention so that Erickson could attempt to open the door with a Lock Jock. Reuter still did not respond. Campbell then threatened to break the window with his night stick if Reuter did not cooperate. Reuter did not respond to the officers. Campbell did not break the window.

Reuter claims that she did not see Officer Campbell arrive on the scene. She claims the first thing she remembers is Campbell trying to break her car window. She then noticed that Campbell's squad car had a New Hope police insignia on its side. She testified that this was her first indication that Erickson and Campbell "might be police officers."

Both Officers Campbell and Erickson testified that the Reuter vehicle was parked directly under a street light. Officer

Campbell stated that he is sure there was enough light for someone to recognize that they were police officers. Reuter claims that she did not initially know that Erickson was a police officer and that she did not notice Erickson's badge or police insignia. There was enough light from the street light, however, to allow her children to write out Christmas lists before Officer Erickson arrived. Mrs. Reuter was also able to see that Erickson was wearing dark slacks, had no hat, had really blonde hair and was a little heavy.

Throughout this time, Reuter continued to hold down the lock buttons. She repeatedly pushed her daughters into their seats when they tried to unlock the doors. Reuter was also yelling, screaming and crying and making gestures toward one of the homes in the cul-de-sac. The officers claim they did not understand the meaning of these gestures. Further, both officers testified that it would have been inappropriate police procedure to leave Mrs. Reuter and the two children in the car to investigate Reuter's claim that her husband was in a nearby home. They could not conduct further investigation until the immediate situation was resolved.

The officers had learned via police radio that the license on Reuter's vehicle had been suspended for lack of insurance. Based on her behavior, Campbell believed that Reuter was mentally ill or unbalanced. He thought it was possible that she was in danger of harming herself or her children. Believing that she was in no condition to drive and had no insurance, Campbell let the air out of the right front tire of Reuter's vehicle. He then called North Memorial Ambulance Service for a medical hold. Later, the officers learned that their computer was in error and that the Reuters did have insurance coverage.

Reuter testified that at this time she was "in a panic." She suspected that Campbell and Erickson might be posing as police officers and were trying to hurt her or steal from her.

As the North Memorial ambulance arrived, Reuter believed the entire situation might be a "set up." She was afraid the officers and the ambulance attendants had conspired to "steal her car or her children." She also thought the ambulance attendants and officers were going to tip her car over. Reuter then ran from her car to try to get to her husband. As Reuter attempted to run past Erickson, Erickson restrained her. Reuter continued to yell, scream, swing, kick and spit at the officer. The paramedics assisted Erickson in handcuffing Reuter and tying her face down onto a stretcher. Reuter continued to kick and thrash around for another several minutes. After she had calmed down, Reuter told Erickson that her husband was at a nearby house completing a reupholstering bid and that his driver's license had been revoked. Officer Erickson asked Reuter why she did not tell this to the officers before, and Reuter responded "I didn't feel like it."

Reuter suffers from severe PMS which causes her to become short-tempered and irritable and makes communication with her difficult. She has also been treated for depression, schizophrenia, a chronic personality disorder and communication problems.

Erickson prepared a form application for a 72–hour medical hold pursuant to Minn. Stat. § 253B.05, subd. 2 (1988). Erickson testified that based on Reuter's preceding conduct, she believed Reuter was in imminent danger of injuring herself or her children and was in no condition to drive.

Wendelyn Reuter was brought to the emergency room at North Memorial Medical Center by the ambulance. Officer Erickson drove David Reuter and the children to North Memorial. Wendelyn Reuter was released from the hospital a short time after speaking with the physician on duty. Erickson then returned Reuter, her husband and her children to their car. Erickson pumped up the right front tire of the Reuter vehicle and allowed Mrs. Reuter to drive the family home.

Wendelyn Reuter and David Reuter filed suit against the City of New Hope and Officers Erickson and Campbell claiming assault, false imprisonment and a violation of Wendelyn Reuter's fourth amendment rights against unreasonable seizure. On a motion for summary judgment by the City

of New Hope and the officers, the trial court granted summary judgment in favor of the City of New Hope, but held that a jury issue exists as to the objective reasonableness of the officers' actions which precluded entry of summary judgment in favor of the officers.

## ISSUES

1. Are Officers Erickson and Campbell entitled to qualified immunity as a matter of law?

2. Are Officers Erickson and Campbell entitled to official immunity as a matter of law?

## ANALYSIS

1. Qualified immunity.

The trial court denied Officers Erickson's and Campbell's motion for summary judgment stating that "a jury issue exists as to the objective reasonableness of the officers' actions." The officers argue they are entitled to qualified immunity, as a matter of law, from the Reuters' 42 U.S.C. § 1983 claims.

 Summary judgment is the most appropriate means for addressing the issue of qualified immunity in a civil rights action against public officials. *Harlow v. Fitzgerald*, 457 U.S. 800, 808, 102 S.Ct. 2727, 2732, 73 L.Ed.2d 396 (1982). The denial of a motion for summary judgment based on a qualified immunity defense is immediately appealable. *Mitchell v. Forsyth*, 472 U.S. 511, 527, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985); *Anderson v. City of Hopkins*, 393 N.W.2d 363, 364 (Minn.1986). The non-moving party has the benefit of the view of the evidence most favorable to him. *Grondahl v. Bulluck*, 318 N.W.2d 240, 242 (Minn.1982).

The *Harlow* court set forth the standard that whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful action generally turns on the "objective legal reasonableness" of the action. *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2739.

*Harlow* * * * recognized an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law. The entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.

*Mitchell v. Forsyth*, 472 U.S. at 526, 105 S.Ct. at 2815.

 Once an official is shown to be protected by qualified immunity, the person opposing the summary judgment motion must establish that the officer's action was objectively legally unreasonable. *See Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). Government officials performing discretionary functions have qualified immunity shielding them from civil liability as long as their actions could reasonably have been thought to be lawful. *Id.* at 637, 107 S.Ct. at 3038. The contours of the right the official is alleged to have violated must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Id.* at 639, 107 S.Ct. at 3039. In light of the pre-existing law, the unlawfulness must be apparent. *Id.*

 The United States Supreme Court applied the *Harlow* test in evaluating the objective reasonableness of a police officer's conduct in *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). Police officers will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have acted in the same manner; but if officers of reasonable competence could disagree on this issue, immunity should be recognized. *Malley*, 475 U.S. at 341, 106 S.Ct. at 1096.

 There is essentially no dispute as to the relevant facts in this case. Our analysis focuses on whether any reasonable officer would have acted in a similar manner given the situation Officers Erickson and Campbell faced.

Officer Erickson was obligated to investigate the suspicious vehicle report. She approached the Reuter vehicle, requested identification and an explanation for Reu-

ter's presence at the scene. Although Reuter's exact conduct towards her children is in dispute, it is undisputed that she was in a panic, refused to respond to the officer's inquiry, refused to allow her children to leave the car and would not identify herself. Viewing the evidence in the light most favorable to Reuter, we cannot say that no reasonably competent officer could question Reuter's mental stability.

Once the ambulance arrived on the scene, Reuter's hysterical conduct escalated. She ran from her car and attempted to get past Officer Erickson. She was apprehended by Officer Erickson and began to kick, thrash around and spit at the officer. We believe that based on this conduct, it cannot be said that no reasonable officer could believe that Reuter was a danger to herself or others.

The Reuters also failed to prove the officers violated a clearly established right. The Reuters claim the officers overreacted to Wendelyn Reuter's refusal to cooperate and her erratic behavior. They argue the officers were unreasonable in ignoring her request to go talk to her husband. These claims do not set forth a violation of a clearly established right.

Wendelyn Reuter also claims that she was unreasonably seized in violation of the fourth amendment.

Although the right to be free from unreasonable seizures is a clearly established right, the Supreme Court of the United States has said that a general constitutional violation alone does not dissolve the qualified immunity. *See Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Instead, the plaintiffs must show that the right the official is alleged to have violated was "clearly established" in a more particularized sense. *Id.* at 635, 639, 107 S.Ct. 3034, 3039 (1987). In the light of pre-existing law, the unlawfulness of the officer's act must be apparent. *Id.* The Reuters have presented no violation of a clearly established law.

The Reuters assert that the case of *Dick v. Watonwan County,* 551 F.Supp. 983 (D.Minn.1982) supports the trial court's determination not to grant summary judgment. The *Dick* case involved a couple who were placed in a detoxification center pursuant to the predecessor to the current Minnesota Commitment Act. The Dicks claimed that social workers involved in the case had violated the Dicks' right to due process of law. The federal district court analyzed the conduct of social workers in light of the *Harlow* case.

The *Dick* case is distinguishable from the present one. In *Dick,* the court focused on whether the county welfare officials acted in good faith. The social workers had ordered the commitment of the Dicks based on certain accusations made by their 15-year-old daughter. The social workers did no further investigation of the situation. They never met with the Dicks or spoke with anyone besides the daughter. The welfare officials' version of the daughter's accusations differed markedly from what the daughter testified. The court felt this discrepancy provided sufficient weight to the Dicks' allegation that the welfare officials in bad faith distorted and embellished the daughter's accusations. The court, therefore, denied summary judgment on those grounds. *Dick,* 551 F.Supp. at 995.

These facts are not analogous to the case at hand. Officers Erickson and Campbell were at the scene with Mrs. Reuter and observed her conduct firsthand. The Reuters presented no evidence that Officers Erickson and Campbell acted in bad faith.

■ We find the trial court erred in failing to discuss the *Harlow* standard in its order denying the officers' motion for summary judgment. The focus for qualified immunity is not whether questions of fact exist. Rather, it is whether the officers violated a particularized law at the time of their conduct and whether no reasonable officer would have acted similarly.

We find that Officers Erickson and Campbell are entitled to qualified immunity as a matter of law. There is no evidence that they violated a particularized law in dealing with Wendelyn or David Reuter. Furthermore, we cannot say that no objectively reasonable officer would have placed an emergency medical hold on Wendelyn Reuter in light of her erratic and violent behavior.

2. Official immunity.

Officers Erickson and Campbell claim that the Reuters' state law tort claims against them are barred by the official immunity doctrine as set forth in *Elwood v. Rice County*, 423 N.W.2d 671 (Minn.1988).

Official immunity is an immunity from suit and the question may be appropriately resolved on summary judgment. *See Elwood* at 679.

The official immunity doctrine provides that "a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of willful or malicious wrong." *Elwood*, 423 N.W.2d at 677 (quoting *Susla v. State*, 311 Minn. 166, 175, 247 N.W.2d 907, 912 (1976)).

The threshold question in applying the official immunity doctrine is whether "discretionary" conduct is involved. While this is generally a question which turns on the facts of each case, Minnesota courts have repeatedly suggested that "police charged with the duty to prevent crime and enforce laws are not purely 'ministerial officers,' and that many of their duties are 'an executive character involving the exercise of discretion.'" *Elwood* at 678 (quoting *Cook v. Trovatten*, 200 Minn. 221, 224, 274 N.W. 165, 167 (1937)).

> The law * * * calls for police in emergency situations to exercise significant independent judgment based on the facts before them. They are afforded a wide degree of discretion precisely because a more stringent standard could inhibit action.

*Id.* 423 N.W.2d at 678.

Officers Erickson and Campbell were exercising the kind of discretionary judgment intended to be protected by official immunity. They responded to a suspicious vehicle call and encountered a woman who, they believed, was mentally unbalanced. Their decision to detain Reuter for emergency medical hold was discretionary based on the situation before them.

Further, the record is completely void of any suggestion that the officers acted out of ill will or malice. The Reuters may not rely on "bare allegations of malice" to defeat a summary judgment, but must present specific facts evidencing bad faith. *Harlow*, 457 U.S. at 817, 102 S.Ct. at 2737.

Since the officers were acting in a discretionary manner and the Reuters presented no evidence the officers acted in bad faith, the trial court erred in denying the officers' motion for summary judgment.

Since we reverse the trial court on the issues of qualified and official immunity we need not address appellants' argument regarding immunity under the Minnesota Commitment Act.

## DECISION

Officers Erickson and Campbell are entitled to qualified immunity as a matter of law against the Reuters' section 1983 claims. The Reuters failed to present evidence that the officers violated a clearly established law or acted in an objectively unreasonable manner.

The officers are also entitled to official immunity as a matter of law against the Reuters' common law tort claims. The Reuters failed to present any evidence that the officers acted in a willful or malicious manner towards the Reuters.

Reversed.