**NORTHERN STATES POWER CO.,**
d/b/a Xcel Energy, Petitioner/Plaintiff, Appellant,

v.

**CITY OF MENDOTA HEIGHTS,**
Respondent/Defendant,
Respondent,

and

**Power Line Task Force, Inc.,**
Intervenor, Respondent.

No. C3–02–65.

Court of Appeals of Minnesota.

July 16, 2002.

Eric J. Magnuson, Peter Gray, Rider, Bennett, Egan & Arundel, LLP, and Harold J. Bagley, Assistant General Counsel, Northern States Power Co., d/b/a Xcel Energy, Minneapolis, for appellant.

Pierre N. Regnier, Jessica E. Schwie, Jardine, Logan & O'Brien, P.L.L.P., Lake Elmo, for respondent City of Mendota Heights.

Michael C. Black, Michael C. Black Law Office, Ltd., St. Paul, for respondent Power Line Task Force, Inc.

Considered and decided by KLAPHAKE, P.J., and G. BARRY ANDERSON, and STONEBURNER, JJ.

## OPINION

KLAPHAKE, Judge.

Appellant Northern States Power Co., d/b/a Xcel Energy (Xcel) brought this mandamus petition and declaratory judgment complaint against respondent City of Mendota Heights to compel the city to approve its application for a conditional use permit (CUP) under the automatic approval provisions of Minn.Stat. § 15.99 (2000). Xcel applied for the CUP to upgrade an existing transmission line running through the city. Power Line Task Force, Inc. (PLTF), a group of private citizens who live near the existing line, was allowed to intervene in support of the city's position.

On cross motions for summary judgment, the district court concluded that Xcel was equitably estopped from asserting its right to automatic approval of the CUP under section 15.99. The court did not reach the other issues raised by the parties, including whether section 15.99 "unconstitutionally violates due process" or whether a later enacted franchise ordinance applies to Xcel's pending CUP application.

Because, under the undisputed facts of this case, Xcel did not approve an extension of the deadline for acting on its CUP application beyond September 8, 2000, and because the city did not act prior to that date, Xcel is entitled to issuance of the CUP under section 15.99. We therefore reverse.

## FACTS

On March 2, 1999, Xcel filed an application with the city for a conditional use permit to allow Xcel to upgrade an existing single-circuit transmission line to a double-circuit transmission line. The line runs through several other cities in the southeast metropolitan area, including South St. Paul and Sunfish Lake. The project would replace the existing poles with new, single-steel pole structures approximately 25 feet higher than the existing ones.

By statute, the city had 60 days from Xcel's filing of the permit application to act. Minn.Stat. § 15.99 (2000). This time deadline was suspended pending completion of proceedings before the Minnesota Environmental Quality Board (MEQB).[1] *See* Minn.Stat. 116D.04, subd. 2a(c) (1998) (allowing any group of 25 or more individuals to petition MEQB to consider whether proposed construction project has "potential for significant environmental effects"). In November 1999, the MEQB determined that the project did not have the potential for significant adverse environmental effects. With the conclusion of the MEQB proceedings, the parties agreed that the city's 60–day statutory review period would resume.[2] *See* Minn.Stat. § 15.99, subd. 3(e). On December 3, the city sent Xcel a letter in which it set out the parties' agreement that the review period under section 15.99 would resume on January 25, 2000, when the next planning commission meeting was scheduled to be held, and expire on February 9, 2000, "unless further extended by the [c]ity."[3]

On January 25, the city's planning commission met and reviewed the CUP application. Xcel representative Pat Cline ver-

bally agreed "to continue the hearing to next month" due to the amount of materials the commission had recently received and the fact that not all neighbors had received notice of the meeting. Cline indicated that "[Xcel] had no dispute with the [c]ity regarding the starting and ending dates for the 60–day review period and that [Xcel] was more than happy to come back to the February * * * meeting." The commission passed a motion to continue the public hearing on the CUP application until its February 22 meeting and "to extend the 60–day review period for an additional sixty days." On February 11, two days after the February 9 deadline passed, the city sent Xcel a letter confirming that the planning commission had extended the review period for an additional 60 days, to April 9.

At its February 22 meeting, the planning commission recommended denial of the CUP. The commission cited concerns regarding potential health and safety risks associated with the project, possible detrimental impacts on nearby property values, and the need for a review of the project on a regional basis because of its impact on several cities and jurisdictions.

1. Proceedings were also held before the Minnesota Public Utilities Commission (MPUC), on a petition alleging that the electric and magnetic fields (EMT's) from the existing transmission line caused illnesses and miscarriages. *See* Minn.Stat. § 216B.17 (1998) (allowing any 50 or more utility customers to file complaint with MPUC if they believe utility's service does not meet standards of Minn.Stat. § 216B.04). After two days of hearings, the MPUC issued an order concluding that it did "not believe that the current record, or any record that could be developed with the resources at hand and the current state of scientific knowledge, justifies shutting down that Southeast Metro Power Line." On appeal to this court, the MPUC's decision was affirmed because not arbitrary and capricious. *Power Line Task Force, Inc. v. Pub. Util. Comm'n,* C8–00–1143, 2001 WL 481949 (Minn.App. May 8, 2001).

2. Power Line Task Force, Inc. (PLTF) also attempted to challenge the MEQB's order in Ramsey County District Court. The district court eventually granted summary judgment to the MEQB and dismissed PLTF's complaint. *Power Line Task Force, Inc. v. Minn. Envt'l Quality Bd.,* No. 62–C3–99–010952 (Aug. 24, 2000).

3. The city also informed Xcel that it would also need to apply for a wetlands permit and a critical areas permit. Xcel submitted these additional permit applications, and the parties agreed that these new applications would be considered with the CUP application but would not extend the review period for the original CUP application.

On March 6, the city council met to consider the recommendations of the planning commission. The city proposed that Xcel hire an independent consultant and that a "Regional Steering Committee" be created to involve the other cities along the power line. Xcel agreed to the proposal and agreed that the statutory period of review would be extended as long as the work of the committee was done in good faith and within a set time limit.

On April 4, the city council adopted a resolution authorizing the creation of the steering committee. The resolution further provided that the steering committee would retain an independent consultant to review the project and advise the committee. The city passed a second resolution denying Xcel's permit application unless "[Xcel] submits a letter formally extending the review period for a period of five months from April 9." On April 5, Xcel agreed in writing to an extension of the review period to September 8, 2000.

As planned, Xcel recommended several consultants and one was chosen by the regional steering committee. The committee met several times over the next few months. As agreed, Xcel paid the fees and monitored the progress of the consultant's study.

The September 8, 2000 deadline, however, passed without any communication between Xcel and the city. The issue was not discussed until mid-March 2001, when an Xcel representative raised the issue with the city regarding the lack of "any documentation or exchange between us extending" the September 8 deadline and the possibility of a "de facto approval."

In March 2001, the consultant issued a final report to the committee. The consultant agreed that the project was necessary and that it would eliminate the concern of electrical outage of the existing circuit and other associated lines. After evaluating five alternatives to the project, the consultant concluded that Xcel's "proposed plan comes closest to meeting the electrical supply requirements, taking into account the economic cost of the improvements." The consultant further concluded: "Double-circuiting the existing line on the existing right-of-way will reduce the electric and magnetic fields."

On April 10, Xcel met with the city's mayor. The mayor informed Xcel that its permit application was on the agenda for the next planning commission meeting, scheduled for April 24. Xcel responded that it "declined to again appear before the Planning Commission, having appeared before that body at the beginning of the process." The mayor agreed that the record was complete, but now "believed that the [c]ity should require [Xcel] to offer to buy houses affected by EMF levels above a certain threshold as a permit condition."

On May 8, 2001, Xcel sent a letter to the city demanding that the city issue the permit by June 5, 2001. Xcel stated that it had not approved any further extension of the September 8, 2000 deadline and that it "has not waived and does not waive its entitlement to issuance of a permit under [section 15.99]."

On May 15, the city enacted an ordinance prohibiting any utility from obtaining a permit to expand or construct new or existing facilities within the city without first obtaining a franchise agreement with the city. When introducing the ordinance, the mayor specifically referred to Xcel's May 8 demand letter and acknowledged that the franchise ordinance was intended to defeat Xcel's permit application.

Xcel thereafter brought this mandamus and declaratory judgment action, claiming that the review period under section 15.99 had expired on September 8, 2000, without any action by the city and that the permit

was therefore automatically approved as of that date by operation of section 15.99. In granting summary judgment to the city, the district court determined that on April 5, 2000, when Xcel agreed to extend the review period to September 8, 2000, it

also agreed that it would recommend several possible consultants to the Steering Committee and would pay the fees of the consultant selected. By taking this position, [Xcel] approved not only an extension to the review period under § 15.99, but also that [the city] would be allowed to obtain a report from an independent consultant as part of the process of deciding whether to approve or deny the CUP application.

The district court concluded that Xcel is "equitably estopped from asserting that it has the right to automatic and unconditional approval of its Conditional Use permit under Minn.Stat. § 15.99."

## ISSUES

I. Did the district court err by concluding that Xcel, by its actions or conduct, either approved an extension to the September 8, 2000 deadline or waived its rights under Minn.Stat. § 15.99?

II. Can the city deny Xcel's permit based on the franchise ordinance?

III. Is Minn.Stat. § 15.99 unconstitutional as applied to this case?

## ANALYSIS

 Summary judgment is appropriately granted when no genuine issues of material fact exist and one party is entitled to judgment as a matter of law. Minn. R. Civ. P. 56.03. When, as here, the district court's summary judgment determination involves the application of a statute to undisputed facts, our review is de novo. *O'Malley v. Ulland Bros.*, 549 N.W.2d 889, 892 (Minn.1996); *see also Am. Tower, LP*

*v. City of Grant*, 636 N.W.2d 309, 312 (Minn.2001) (construction and application of Minn.Stat. § 15.99 is question of law, which reviewing court considers de novo). Similarly, we review de novo the district court's decision on a petition for a writ of mandamus that is based solely on legal determinations. *Demolition Landfill Servs., LLC v. City of Duluth*, 609 N.W.2d 278, 280 (Minn.App. Apr.25, 2000), *review denied* (Minn. July 25, 2000).

## I.

A city must approve or deny a written permit application within 60 days under the following statute:

Except as otherwise provided in this section and notwithstanding any other law to the contrary, an agency must approve or deny within 60 days a written request relating to zoning, septic systems, or expansion of the metropolitan urban service area for a permit, license, or other governmental approval of an action. *Failure of an agency to deny a request within 60 days is approval of the request.* If an agency denies the request, it must state in writing the reasons for the denial at the time that it denies the request.

Minn.Stat. § 15.99, subd. 2 (2000) (emphasis added). Extensions to this initial 60–day period are allowed as follows:

An agency may extend the time limit * * * before the end of the initial 60–day period by providing written notice of the extension to the applicant. The notification must state the reasons for the extension and its anticipated length, which may not exceed 60 days *unless approved by the applicant.*

Minn.Stat. § 15.99, subd. 3(f) (2000) (emphasis added).

Because this statute is unambiguous, this court must "give effect to the statute's

plain meaning." *Am. Tower*, 636 N.W.2d at 313 (quotation omitted). While automatic approval of a permit application is an extraordinary remedy, Minnesota appellate courts have shown no reluctance to grant this remedy and enforce the provisions of section 15.99 when a city has failed to satisfy its clear requirements. *See, e.g., id.* (holding that city required to issue CUP under section 15.99, when city failed to make decision within 60 days of submission of application and failed to obtain extension); *Kramer v. Otter Tail County Bd. of Comm'rs*, 647 N.W.2d 23, 24 (Minn. App. 2002) (holding that if agency fails to approve or deny zoning application within 60–day limit imposed by section 15.99, applicant is entitled to writ of mandamus); *Demolition Landfill*, 609 N.W.2d at 281 (holding that because city council's rejection of resolution granting permit not equivalent to denial of permit application, permit is deemed approved under section 15.99).

### A. Equitable Estoppel

The district court concluded that Xcel was equitably estopped from asserting its right to automatic approval under section 15.99. Equitable estoppel is a question of law subject to de novo review. *State v. Ramirez*, 597 N.W.2d 575, 577 (Minn.App.1999). The doctrine requires misrepresentation of a material fact by a party knowing it to be false and intending it to be acted upon to the other party, who has no knowledge of the truth and relies upon the misrepresentation to its detriment. *Hydra–Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 919 (Minn.1990); *Transamerica Ins. Group v. Paul*, 267 N.W.2d 180, 183 (Minn.1978). Because the city has failed to provide any evidence on several of the elements necessary to prove equitable estoppel, we conclude that the district court erred in granting the city summary judgment on that basis.

First, the city failed to provide evidence that Xcel intentionally made any misrepresentations regarding the September 8, 2000 deadline. While some of Xcel's representatives made statements to the city council in the spring of 2000 to the effect that Xcel was willing to agree to additional extensions beyond September 8, the city never formally sought Xcel's approval of additional extensions.

Second, the city was well aware of the September 8 deadline and of the requirements of section 15.99, because it had carefully documented all of its prior extensions in writing. Thus, the city cannot claim that the deadline was somehow concealed or that it had no knowledge of its obligations under the statute.

Third, and most important, the city cannot prove reasonable reliance. Although the city claims that it reasonably relied on Xcel's commitment to participate in the regional review process and allow time for review of the consultant's report in each of the individual cities, the city knew about the September 8 deadline, yet failed to act before that date by either seeking Xcel's approval of another extension or by acting on Xcel's permit application. At best, the city might claim that the September 8 deadline passed because of oversight or mistake, but it cannot prove that it reasonably relied on that mistake. We therefore conclude that the district court erred in determining that Xcel is equitably estopped from asserting its rights under section 15.99.

### B. Waiver

Waiver is the voluntary relinquishment of a known right, and is ordinarily a question of fact for a jury unless "only one inference can be drawn from the facts." *Engstrom v. Farmers & Bankers*

*Life Ins. Co.*, 230 Minn. 308, 312, 41 N.W.2d 422, 424 (1950) (citations omitted); *Flaherty v. Indep. Sch. Dist. No. 2144*, 577 N.W.2d 229, 232 (Minn.App.1998), *review denied* (Minn. June 17, 1998). Because the relevant facts here are fairly undisputed, the city's claim of waiver presents us with a legal issue.

Subdivision 3(f) precludes any extension beyond two 60–day periods "unless approved by the applicant." Minn.Stat. § 15.99, subd. 3(f). Xcel's written approval to allow an extension to September 8, 2000 was explicit and definite, and satisfied the clear requirements of section 15.99. The regional review process was not a zoning necessity and was undertaken by Xcel in cooperation with the involved cities in an effort to coordinate the project. Xcel's written approval of an extension to September 8, 2000 cannot be construed as an open-ended extension of the city's deadline for acting on Xcel's permit application.

The city argues that a party may be bound by its actions and conduct, particularly when there is an opportunity to voice an objection and none is made. *See Anderson v. Twin City Rapid Transit Co.*, 250 Minn. 167, 178, 84 N.W.2d 593, 603 (1957); *Crystal Green v. City of Crystal*, 421 N.W.2d 393, 393–94 (Minn.App.1988), *review denied* (Minn. May 25, 1988). The burden here was not on Xcel to act, however; the burden was on the city to act within the statutory deadline or to request an additional extension from Xcel.

To rule otherwise would be contrary to the plain language of section 15.99 and would add confusion to the interpretation of this statute. The underlying purpose of

this statute is to establish clear deadlines for local governments to take action on zoning applications. *Am. Tower*, 636 N.W.2d at 312. "When courts start to interpret the subtle movements of the players for any evidence of implicit waiver of the deadlines, the purpose behind the automatic approval statutes is diminished." G. Brooker & K. Cole, *Automatic Approval Statutes: Escape Hatches and Pitfalls*, 29 Urban Lawyer 439, 466 (Summer 1997). Acceptance of the city's claim of waiver "would nullify the time frame established by the legislature and is therefore directly contrary to the plain language of the statute." *Am. Tower*, 636 N.W.2d at 313. We therefore conclude that, as a matter of law, Xcel has not waived its rights under section 15.99 and is entitled to automatic approval of its permit as of September 8, 2000.[4]

Finally, even if Xcel's continued participation and lack of objection might be construed as an implicit approval of some other deadline, that implicit approval was ultimately and wholly withdrawn when Xcel made its demand in May 2001 for issuance of its permit under section 15.99.

## II.

Xcel argues that the city cannot deny its permit based on the city's later enacted franchise ordinance. We agree.

Given our decision here, Xcel's permit is automatically approved as of September 8, 2000. Because the city's franchise ordinance was not enacted until May 15, 2001, it cannot be cited as a basis for denial of Xcel's permit.

---

4. While Xcel also argues that its permit application was automatically approved as early as February 9, 2000, when the city failed to give Xcel timely, written notice of its extension, we need not rule on this argument. We note, however, that the city actually requested an extension of the February 9 deadline prior to its expiration at a public meeting before the planning commission and that Xcel, through its representative Pat Cline, verbally acquiesced in the city's extension of the deadline for an additional 60 days.

In addition, the Minnesota Supreme Court has warned zoning authorities that they do not have "carte blanche to arbitrarily block otherwise lawful development by the passage of new zoning law." *Interstate Power Co. v. Nobles County Bd. of Comm'rs,* 617 N.W.2d 566, 576 (Minn. 2000). In *Interstate,* the supreme court reversed a county's denial of a CUP that was based in part on the county's amendment of a zoning ordinance while the permit was pending. The court noted that "application of the new setback requirement to this proposed project would result in a 'manifest injustice' that warrants deviation from the usual rule of applying the law as amended." *Id.* Similarly, here, where the city gave no explanation for the enactment of its franchise ordinance and acknowledged that its sole purpose was to defeat Xcel's permit, the city is precluded from relying on its later enacted ordinance to deny the permit.

### III.

■ The city and intervenor PLTF argue that section 15.99 is unconstitutional because it violates procedural due process and the doctrine of separation of powers. This issue was raised below but not addressed by the district court. Given our decision to reverse the district court and rule that the permit is automatically approved, this constitutional issue becomes relevant. Because the issue is a legal one and is adequately briefed on appeal, we address it here rather than remand to the district court.

Even assuming the city or PLTF has standing to assert rights of affected property owners, those property owners have been given ample and adequate notice and opportunity to be heard on Xcel's permit application. The record shows that Xcel's permit application was discussed and reviewed at numerous city planning commission and city council meetings. In addition, many of the environmental concerns were addressed at proceedings before the MEQB, the MPUC, and the regional steering commission. The affected property owners were given notice of these proceedings and were given many opportunities to be heard. *See Gun Lake Ass'n v. County of Aitkin,* 612 N.W.2d 177, 183 (Minn.App. 2000) (rejecting procedural due process challenge to application of section 15.99, when township resident and residents' association given adequate opportunity to be heard), *review denied* (Minn. Sept. 13, 2000). We therefore conclude that the city's and PLTF's claims that automatic approval of Xcel's permit under section 15.99 will violate procedural due process rights are without merit.

■ The city and PLTF also argue that automatic approval under section 15.99 violates the separation of powers doctrine because it denies affected property owners the right to seek redress for any detriment suffered by issuance of Xcel's permit. To the extent that this argument mirrors the procedural due process claim, which we conclude is without merit, it too must fail. *See Metro. Sports Facilities Comm'n v. Gen. Mills, Inc.,* 470 N.W.2d 118, 125 (Minn.1991) (rejecting "groundless separation of powers claim" that is clothed in meritless procedural due process claim). To the extent that this separation of powers argument is merely a claim by the city that the statute encroaches on its powers to consider zoning matters, such an encroachment is fully within the authority of the legislature to give and revoke. *See N. Border Pipeline Co. v. Jackson County, Minn.,* 512 F.Supp. 1261, 1263 (D.Minn. 1981); *NSP v. City of Granite Falls,* 463 N.W.2d 541, 543 (Minn.App.1990), *review denied* (Minn. Jan. 14 & 24, 1991).

We therefore reject the constitutional challenges to application of section 15.99.

## DECISION

The district court's denial of Xcel's motion for summary judgment, grant of summary judgment to the city, and dismissal of Xcel's complaint and petition for mandamus are reversed. Under Minn.Stat. § 15.99, subd. 3(f), Xcel approved an extension to September 8, 2000, not to some indefinite date in the future. The city easily could have requested that Xcel approve another extension. The city alternatively could have acted on Xcel's permit by September 8, 2000. Because it did neither, by operation of section 15.99, Xcel's permit is automatically approved.

**Reversed.**