**HANS HAGEN HOMES, INC., Respondent,**

v.

**CITY OF MINNETRISTA, Appellant.**

**No. A05–1686.**

Court of Appeals of Minnesota.

May 16, 2006.

Gary A. Van Cleve, Jessica B. Rivas, Larkin Hoffman Daly & Lindgren Ltd., Minneapolis, MN, for respondent.

George C. Hoff, Amanda Morken, Hoff, Barry & Kuderer, P.A., Eden Prairie, MN, for appellant.

Considered and decided by TOUSSAINT, Chief Judge; LANSING, Judge; and RANDALL, Judge.

## OPINION

LANSING, Judge.

On cross-motions for summary judgment, the district court granted Hans Hagen Homes' petition for mandamus to enforce Minn.Stat. § 15.99, subd. 2 (2004), and directed the City of Minnetrista to approve Hagen Homes' application for rezoning and for expanding the metropolitan-urban-service area. The city appeals, and, because we conclude that the district court properly construed the requirements of section 15.99, subdivision 2(c), as mandatory, we affirm.

## FACTS

Hans Hagen Homes, Inc., filed a petition for a writ of mandamus to compel the City of Minnetrista to approve Hagen Homes' application for rezoning and for amending the city's comprehensive plan that would adjust the metropolitan-urban-service-area (MUSA) line. On cross-motions for summary judgment, the district court denied the city's motion, granted Hagen Homes' motion in part, and directed the city to approve the application. The district court denied Hagen Homes' mandamus request to approve its conceptual site plan, and this denial is not disputed on appeal.

Hagen Homes and the city agree on the essential facts. Hagen Homes owns approximately 220 acres of land, divided into six parcels, within the city. In May 2004 Hagen Homes submitted a rezoning application to the city, requesting that the city rezone its parcels from rural agricultural to R–4–PUD and amend its comprehensive plan to adjust the MUSA line to provide Hagen Homes' parcels with public services. The city asked for an extension of the sixty-day statutory time limit to approve or deny the application; Hagen Homes eventually agreed to a November 30, 2004 deadline.

On October 4, 2004, the city council held a public hearing on the application. A Minnetrista city planner presented information on Hagen Homes' request, and a company representative described the project in further detail. After hearing the presentations and public comments, the city denied the application, finding that Hagen Homes' requests were inconsistent with the city's comprehensive plan and that further traffic studies were necessary. The city did not adopt written findings until its October 18, 2004 meeting when it passed a resolution formally denying Hagen Homes' request. Hagen Homes did not have a representative at this meeting.

The city posted minutes of the October 4 and 18 meetings on its website before the November 30, 2004 deadline for action on the application. Copies of the resolution were also available at city hall within forty-eight hours after its adoption. The city did not, however, provide Hagen Homes with a copy of the resolution until December 9, 2004, when Hagen Homes requested a copy from the city.

In March 2005 Hagen Homes filed a petition for mandamus, contending that it was entitled to approval of its application as a matter of law because the city did not provide Hagen Homes with a written statement of denial and the reasons for denial before November 30, 2004, as required by Minn.Stat. § 15.99, subd. 2

(2004). The city appeals from the district court's summary judgment granting Hagen Homes' mandamus petition.

## ISSUE

Did the district court err by concluding that a city's failure to provide an applicant with a written statement of its reasons for denying an application for rezoning and extending a MUSA line before the expiration of the Minn.Stat. § 15.99 deadline for action resulted in approval as a matter of law?

## ANALYSIS

■ To obtain a writ of mandamus, a petitioner must establish that the law clearly requires the performance of the mandatory or purely ministerial act for which the writ will issue. Minn.Stat. § 586.01 (2004); *McIntosh v. Davis*, 441 N.W.2d 115, 118 (Minn.1989). Whether a petitioner has established the grounds necessary to support the issuance of a writ is a question of law. *McIntosh*, 441 N.W.2d at 118.

■ The district court's summary judgment granting the mandamus petition and directing the city to approve Hagen Homes' application is based solely on the city's failure to provide Hagen Homes with a written statement of the city's reasons for denial before expiration of the response deadline as required by Minn.Stat. § 15.99, subd. 2(c) (2004). Because Hagen Homes and the city do not dispute the material facts, we exercise independent review to determine whether the district court erred in its application of the statutory language to the undisputed facts. *See Wiegel v. City of St. Paul*, 639 N.W.2d 378, 381 (Minn.2002) (stating that application of statute to undisputed facts is reviewed de novo).

■ Hagen Homes' and the city's respective arguments focus narrowly on the structure and text of the second and third subdivisions of section 15.99. The first subdivision, which has no provisions in contention, consists of definitions. *See* Minn.Stat. § 15.99, subd. 1 (2004) (defining agency, request, and application). The term "agency" includes all statutory and home-rule cities. *Id.*, subd. 1(b). The city does not dispute that it is an agency governed by the time deadlines for agency action. The second subdivision has three subparts addressing the deadline for responding to requests. *Id.*, subd. 2 (2004). The first and last of these subparts are at the core of this dispute. The third and final subdivision provides the requirements for applications and extensions. *Id.*, subd. 3 (2004) (relating to applications and extensions for agency action). Hagen Homes and the city do not dispute that, at the city's request, Hagen Homes extended the deadline for the city's response to November 30, 2004. But they dispute the significance of subpart (c) of the third subdivision, which provides that an agency that sends its response within sixty days of the written request meets the deadline for agency action. *See id.*, subd. 3(c) (allowing agency to prove compliance by documenting response sent within sixty days of written application).

The first of the core provisions in dispute, subdivision 2(a), contains the operative language that transforms an agency's failure to respond to an application within sixty days into an approval:

Except as otherwise provided in this section, section 462.358, subdivision 3b, or chapter 505, and notwithstanding any other law to the contrary, an agency must approve or deny within 60 days a written request relating to zoning, septic systems, or expansion of the metropolitan urban service area for a permit, license, or other governmental approval of an action. *Failure of an agency to deny a request within 60 days is approval of the request. If an agency*

*denies the request, it must state in writing the reasons for the denial at the time that it denies the request.*

*Id.,* subd. 2(a) (emphasis added). The second of the core disputed provisions, subdivision 2(c), lists the actions that a city council, as a multimember body, must complete to deny effectively an application:

If a multimember governing body denies a request, it *must* state the reasons for denial on the record and provide the applicant in writing a statement of the reasons for the denial. If the written statement is not adopted at the same time as the denial, it *must* be adopted at the next meeting following the denial of the request but *before* the expiration of the time allowed for making a decision under this section. The written statement *must* be consistent with the reasons stated in the record at the time of the denial. The written statement *must* be provided to the applicant *upon* adoption.

*Id.,* subd. 2(c) (emphasis added). The final provision at issue, contained in subdivision 3(c), provides the deadline for sending a response:

An agency response meets the 60–day time limit if the agency can document that the response was sent within 60 days of receipt of the written request.

*Id.,* subd. 3(c).

The city argues that because subpart (c) of subdivision 2, unlike subpart (a), does not contain a penalty clause, the violation of a requirement in subpart (c) does not result in automatic approval of the application. Specifically, the city argues that a violation of the requirement to "provide the applicant in writing a statement of the reasons for the denial" within the sixty-day deadline, or an authorized extension, does not result in automatic approval. Hagen Homes counters that the requirements of subdivision 2 are mandatory and that the penalty clause of subpart (a) applies to a

violation of any of the requirements in subdivision 2.

In ascertaining the meaning of a statute, our goal is to effectuate the legislative intent. Minn.Stat. § 645.16 (2004). If the language of the statute is unambiguous, we apply its plain meaning. *Id.; Kersten v. Minn. Mut. Life Ins. Co.,* 608 N.W.2d 869, 874–75 (Minn.2000). If the statutory language is unclear, however, we consider other factors that would reveal the legislative intent, including the need for the law, the circumstances of its enactment, the purpose of the statute, the consequences of a particular interpretation, and the contemporaneous legislative history. Minn. Stat. § 645.16; *State v. Loge,* 608 N.W.2d 152, 155 (Minn.2000).

We determine whether a statute has a plain meaning by reviewing its content and framework. *Genin v.1996 Mercury Marquis,* 622 N.W.2d 114, 117 (Minn. 2001). Reviewing statutory language for plain meaning requires us to analyze the language in the full context of the act or provision. *Christensen v. Dep't of Conservation, Game & Fish,* 285 Minn. 493, 499–500, 175 N.W.2d 433, 437 (1970) (observing that statute must be read as whole and that meaning should be ascertained from context). We must consider sections of a statute together to determine plain meaning. *Chanhassen Estates Residents Ass'n v. City of Chanhassen,* 342 N.W.2d 335, 339 (Minn.1984); *see also Smith v. Barry,* 219 Minn. 182, 187, 17 N.W.2d 324, 327 (1944) (instructing that statute must be considered as whole to harmonize and give effect to all provisions).

Determining the integrated plain meaning requires us to "read a particular provision in context with other provisions of the same statute in order to determine the meaning of the particular provision." *ILHC of Eagan, LLC v. County of Dakota,* 693 N.W.2d 412, 419 (Minn.2005); *see also*

*Glen Paul Court Neighborhood Ass'n v. Paster,* 437 N.W.2d 52, 56 (Minn.1989) (recognizing that sections of statute must be read together because arrangement of sections may provide plain meaning); *Kollodge v. F. & L. Appliances, Inc.,* 248 Minn. 357, 360, 80 N.W.2d 62, 64 (1956) (stating that particular provision of statute cannot be read out of context).

The Supreme Court has recognized that, in discerning plain meaning, a provision that seems ambiguous in isolation may be clarified by the remainder of the statute because "the same terminology [may be] used elsewhere in a context that makes its meaning clear or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 630, 98 L.Ed.2d 740 (1988) (citation omitted). Thus, statutory construction includes not only attention to the specific words, but also "the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997). Finally, looking at the statute as a whole and reading each section in context with all other sections, satisfies the statutory presumption that the legislature intends an entire statute to be effective and certain. Minn. Stat. § 645.17(2) (2004).

Reading the subdivisions of section 15.99 together reveals a plain meaning that is evident in the interdependent functioning of the subdivisions. Subdivision 2(c) interrelates with subdivision 2(a) by providing additional and more specific explanation of its requirements. The district court correctly reasoned that because subpart (c) refers back to subpart (a), the same penalty applies even though the legislature did not insert it a second time into subpart (c). In a subdivided section that

focuses successively on various aspects of the response deadline, a presumption that the contents of each subdivision must be restated in the parallel subdivisions would defeat the obvious purpose of the serial division. The context and the coordinated effect establish that the penalty in subdivision 2(a) is interrelated with, and applies to, the requirements in subdivision 2(c). Importantly, if subdivision 2(a)'s penalty did not apply to subdivision 2(c), the statute would provide no penalty for violating the mandatory requirements in subdivision 2(c).

Finally, unless subdivisions 2(a) and 2(c) combine to provide the penalty of automatically granting the application if the agency does not provide a written response to the applicant within sixty days, the language of subdivision 3(c) would not make sense. Subdivision 3(c) provides that an "agency response meets the 60–day time limit if the agency can document that the response was sent within 60 days of the written request." Unless the failure to provide a written response to the applicant triggers the automatic-issuance penalty, the reference to the sixty-day limit would be superfluous and subdivision 3(c) would have no effect. *See ILHC,* 693 N.W.2d at 419 (stating that "[w]henever possible, no word, phrase, or sentence should be deemed superfluous, void, or insignificant" (quotation omitted)).

The city's spirited argument for reversal does not assert that the statute is ambiguous but argues for a plain meaning that would isolate rather than harmonize subdivisions 2(a) and 2(c). To accept the city's argument, we would have to reject the contextual plain meaning that inheres in the interdependent sections, divide rather than harmonize the text, and constrain or void the effect of subdivision 3(c). We would also have to reject appellate caselaw that explicitly or implicitly interprets the

requirements in section 15.99, subdivision 2, as mandatory and necessary to complete within the deadline for agency action.

In *Manco of Fairmont, Inc. v. Town Board of Rock Dell Township*, 583 N.W.2d 293, 295 (Minn.App.1998), *review denied* (Minn. Oct. 20, 1998), this court determined that the requirements of subdivision 2, were mandatory because the statute "expresses the consequences of a failure to comply with its provisions." In *Demolition Landfill Services, LLC v. City of Duluth*, 609 N.W.2d 278, 281–82 (Minn.App. 2000), *review denied* (Minn. July 25, 2000), we again characterized the requirements of subdivision 2 as mandatory and essential to an effective denial. After this court issued *Manco* and *Demolition Landfill*, the legislature amended subdivision 2 by adding subparts (b) and (c). 2003 Minn. Laws ch. 41, § 1 at 322. Although the amendments do not directly impact our analysis, the legislature notably did not include in the amendments any indication that the provisions of subdivision 2 were not mandatory. *Id.; see* Minn.Stat. § 645.17(4) (2004) (stating presumption that, after court has construed statute, legislature intends same construction in subsequent laws); *State v. Anderson*, 666 N.W.2d 696, 700 (Minn.2003) ("[W]hen the legislature does not amend our construction of a statute, the court's construction stands."). Finally, earlier this year we concluded that the simultaneous-written-reason requirements in subdivisions 2(a) and 2(c) are mandatory and must be completed within the sixty-day deadline, or an authorized extension, for agency action. *Veit Co. v. Lake County*, 707 N.W.2d 725, 730 (Minn.App.2006), *review denied* (Minn. Apr. 18, 2006).

Significantly, *Veit* presented an issue that also required a hybrid application of subdivisions 2(a) and 2(c) because both subparts (a) and (c) address the writing requirement. In *Veit*, the county planning commission initially denied Veit's application within the deadline, but failed to provide written reasons for the denial. *Id.* at 727. The county argued that it fulfilled the purpose of the statute because it provided a written denial within the time limit for agency action, and the public-hearing transcript demonstrated that the county had a reasonable basis for denying the application. *Id.* at 727–28. We concluded that, even if the transcript had been sufficient to satisfy the writing requirement of subdivision 2(a), the record contained no evidence that the county provided the applicant with a copy before the deadline expired, as required by subdivision 2(c). *Id.* at 730. Consequently, we held that the application was approved as a matter of law. *Id.*

The plain meaning of subdivision 2 is that the agency must provide the applicant a written statement of the reasons for denying an application within the sixty-day statutory deadline, or an authorized extension, and that failing to do so results in approval of the application as a matter of law. Minn.Stat. § 645.16; *Ed Herman & Sons v. Russell*, 535 N.W.2d 803, 806 (Minn.1995).

Plain meaning is the governing principle in applying all statutory language. Yet, Minnesota courts will not give effect to plain meaning if it produces an absurd or unreasonable result that is plainly at variance with the policy of the legislation as a whole. Minn.Stat. § 645.17(1) (2004); *see also Olson v. Ford Motor Co.*, 558 N.W.2d 491, 495 (Minn. 1997) (discussing need to avoid absurd result); *Wegener v. Comm'r of Revenue*, 505 N.W.2d 612, 617 (Minn.1993) (discussing need to avoid unreasonable result at variance with statute's purpose). This court has previously determined that the underlying purpose of section 15.99 is to "establish[ ] time deadlines for local governments

to take action on zoning applications." *Tollefson Dev., Inc. v. City of Elk River*, 665 N.W.2d 554 (Minn.App.2003) (citing *Am. Tower, L.P. v. City of Grant*, 636 N.W.2d 309, 312 (Minn.2001)). Thus our determination of the statute's plain meaning is consistent with the manifest purpose of section 15.99.

■■■ The city contends that the automatic approval of the application is a disproportionate sanction for a technical failure to mail the resolution to Hagen Homes, particularly because Hagen Homes does not dispute that it had actual notice of the application's denial. We agree that the penalty is harsh, and we share the observations of the special concurrence that a prejudice requirement would temper the risk of public injustice. But when a statutory provision is clear on its face and consistent with the manifest purpose of the legislature, courts do not subject the statute to further analysis because without deference to clear statutory language, "legislators will have difficulty imparting a stable meaning to the statutes they enact." *Krzalic v. Republic Title Co.*, 314 F.3d 875, 879–80 (7th Cir.2002) (recognizing that deference to plain meaning keeps branches of government in equilibrium and "preserve[s] language as an effective medium of communication from legislatures to courts").

■■■ We must presume that the legislature understood the effect of its words and intended the language of the statute to be effective and certain. Minn.Stat. § 645.17(2); *Van Asperen v. Darling Olds, Inc.*, 254 Minn. 62, 74, 93 N.W.2d 690, 698 (1958). "While automatic approval of a permit application is an extraordinary remedy, Minnesota appellate courts have shown no reluctance to grant this remedy and enforce the provisions of section 15.99[if] a city has failed to satisfy its clear requirements." *N. States Power Co. v. City of Mendota Heights*, 646 N.W.2d 919,

925 (Minn.App.2002), *review denied* (Minn. Sept. 25, 2002); *see also Moreno v. City of Minneapolis*, 676 N.W.2d 1, 6 (Minn.App. 2004). (holding that application was approved as matter of law even though it was harsh and extraordinary remedy). When a statute's language is plain, the function of the courts is to enforce it according to its terms. Minn.Stat. § 645.16. We therefore affirm the district court's summary judgment on the petition for mandamus.

### DECISION

Because the city failed to provide Hagen Homes with a written statement of the reasons for denying its application within the agreed-on extension of the sixty-day deadline, the district court did not err by granting summary judgment in the mandamus action and determining that the application was approved as a matter of law.

**Affirmed.**

RANDALL, Judge (concurring specially).

The court today correctly interprets the express language of Minn.Stat. § 15.99 (2004). Today's decision represents the present legislative intent of section 15.99, which requires municipalities to provide written notice of a decision to the petitioning party within (a strict) 60 days. *Am. Tower v. City of Grant*, 636 N.W.2d 309, 313 (Minn.2001), *Veit Co. v. Lake County*, 707 N.W.2d 725, 728–29 (Minn.App.2006), *review denied* (Minn. Apr. 18, 2006). Today's finding is in accordance with the plain language of section 15.99. I write separately to underscore the inherent danger in this rigid legislative scheme. I suggest this issue must be revisited by the Minnesota Supreme Court or the legislature to make the changes needed to protect municipalities and their citizenry from unnecessary negligence liability, while not

interfering with the right of aggrieved parties to pursue remedies.

Municipalities, like Minnetrista, find themselves in a difficult situation. When Hans Hagen asked for a variance, Minnetrista deemed such a variance injurious and ultimately sought to deny the request. The decision this court reaches today, based on a rigid application of the statute, cannot take into consideration the type of variance sought by Hans Hagen, and the failure of Hans Hagen to exhibit any actual prejudice.

For instance, had Hans Hagen sought to construct a tire-burning industrial unit, a coal-fired power plant, a monstrous metal-shredder plant, a car battery/freon disposal plant, etc., today's decision would grant and allow a potential injurious business too operate in residential Minnetrista. Anyone seeking a variance for something they have no chance to get, but are willing to pay the application fee and "take a shot" could file for a variance just to see what happens. With an administrative slip of the pen, as we have here, and with no showing of actual prejudice (with candor, respondent agrees that the short time-lapse caused none) it looks like the law mandates granting that variance.

I suggest there is precedent for examining an extremely short statute of limitations to see whether any actual prejudice has resulted, and, if not so, to work that into a common-sense reading of the law.

The Minnesota Supreme Court held that arbitrary deadlines are sometimes "unduly harsh." *Terrell v. State Farm Ins. Co.*, 346 N.W.2d 149, 152 (Minn.1984). In *Terrell* the supreme court conducted a similar analysis as this court does today regarding a strictly worded legislative scheme. *Id.* The supreme court noted that *absent such direct statutory direction*, public policy would require an avoidance of injustice through requiring actual prejudice. *Id.* at 151. In recognizing disfavor on forfeiture of decisions or policies due to the passing of arbitrary deadlines, the legislature amended the statute at issue in *Terrell* to require a showing of actual prejudice. 1984 Minn. Laws ch. 592, § 55, at 1282. Subsequent decisions from this court then did not apply the same strict scrutiny administered by the supreme court in *Terrell* partly due to the legislature's change in heart. *See, e.g., LaFriniere v. State Farm Mut. Auto. Ins. Co.*, No. C5–88–1582, 1989 WL 23535, at *2 (Minn.App. Mar.21, 1989). In general, actual prejudice need be shown or there may be a limit to recovery. *L & H Transport, Inc. v. Drew Agency, Inc.*, 369 N.W.2d 608, 611 (Minn.App.1985), *aff'd* 384 N.W.2d 435 (Minn.1986) . . .

Respondents responsibly admit that Minnetrista's decision was not arbitrary and capricious and that actual oral notice of the rejection was received at the October 9, 2005 meeting.

If the supreme court and legislature maintain the strict interpretation of Minn. Stat. § 15.99, that we see today, the inherent right of a municipality to fulfill its duty to protect the citizenry from unhealthy variances is emasculated. Normal statutes of limitation are commonly two, three, or six years to allow individuals and organizations the ability to adequately protect themselves from liability. *See, e.g.,* Minn. Stat. § 541.07 (2004) (imposing two-or-three-year limitations on certain claims), Minn.Stat. § 17.9441, subd. 5 (2004) (imposing six-year statute of limitations on agricultural contract violations). The time limit here is 60 days. Hans Hagen admits that they were given constructive knowledge that the variance request was rejected after the vote at the first meeting. Without a showing of any actual prejudice, Hans Hagen's request for relief should be—ideally—scrutinized and the interests of the public weighed against those of Hans Hagen.

The relatively short delay, nine days, to Minnetrista's actual notice of denial in this case highlights the flaw within the harsh interpretations required by Minn.Stat. § 15.99. I believe that the supreme court or the legislature needs to reexamine the automatic approval of a variance to require a showing of at least some actual prejudice before overriding a municipality's right to safeguard itself from harm. Hans Hagen was unable to show any prejudice suffered because of the nine day delay. If Minnetrista's letter had not arrived after six months, or one year, a showing of actual prejudice could be doable. That is a case for another day based on those facts.

The second huge "bear in the kitchen" is the potential unlimited liability of Minnetrista and other similarly situated municipalities for classic ministerial negligence and easily provable damages. With the right noxious plant in place in a neighborhood because of a nine-day delay, or a six-day delay, or a one-day delay, every abutting landowner, residential or commercial, and possibly every homeowner within a strong wind's smelling distance of a plant would be able to show through independent appraisal that the value of their property was reduced by ministerial negligence of the municipality.

The doctrine of common-law official immunity protects municipalities from liability arising from discretionary decisions. *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn.1988). That is boilerplate law and needs no elaboration. But it is also equally clear that municipalities are subject to claims for ministerial negligence. An act is ministerial "when it is absolute, certain and imperative, involving merely execution of a specific duty arising from fixed and designated facts." *Rico v. State*, 472 N.W.2d 100, 107 (Minn.1991) (quoting *Cook v. Trovatten*, 200 Minn. 221, 224, 274 N.W. 165, 167 (1937)). Whether a given action is discretionary or ministerial is a question that turns on the facts of each case. *Reuter v. City of New Hope*, 449 N.W.2d 745, 751 (Minn.App.1990), *review denied* (Minn. Feb. 28, 1990). Minnetrista has the protection of discretionary immunity to debate an ordinance, to pass or not pass one, and to grant or not grant zoning variances. Municipalities are shielded when they balance the standard laundry list, economic, social, political, etc. *Nusbaum v. County of Blue Earth*, 422 N.W.2d 713, 720 (Minn.1988). With regard to ministerial duties required of a public official, the Supreme Court has stated that if "he neglects or refuses to do such act, he may be compelled to respond in damages to the extent of the injury arising from his conduct. A mistake as to his duty and honest intentions will not excuse the offender." *Amy v. Supervisors*, 11 Wall. 136, 78 U.S. 136, 138, 20 L.Ed. 101 (1870).

Once Minnetrista formally denied Hans Hagen's request, the instructions to the clerk to follow the statutory instructions for mailing were *purely ministerial.* After receiving a directive from the city council, there is no "discretion" in an employee not to put something in the mail within a clearly delineated statutory timeline. That directive is absolute, is not debatable, involves no economic balancing of interests (other than the expenditure of a $.39 stamp), and without giving an advisory opinion, it is difficult to conjure up a decent argument that the failure here to observe the 60–day deadline (albeit just nine days late) was anything but purely ministerial. A case could be built by a competent lawyer that failure to do so within the unambiguous statutory time constitutes at least enough "slight negligence" to build a cause of action on.

This is the apocalyptic scenario that, like tax day, April 15, is never too far off. In a hypothetical involving a coal-fired power plan or a metal-shredder, etc., etc., it would be difficult for a municipality to

defend a claim of actual damages by owners of real property anywhere within sightlines, or the wind-blown areas, or the entire community.

I strongly suggest that with section 15.99, some showing of actual prejudice should be determinative of the issue before us. In determining whether actual prejudice can be shown, the lapse of time would assist in determining liability on a case-by-case basis.

When determining the scrutiny necessary in matters like this, judges need the flexibility to balance the harshness of the penalty in relation to the shortness of the time limit in relation to actual prejudice shown. In the case of the minor delay involved here, Minnetrista should be given some latitude in their ability to make a decision that will severely impact those the municipality is charged to protect.

This is not to infer that Hans Hagen will not be a good neighbor; it is to state unequivocally that a bad neighbor would be in the same shoes as Hans Hagen is today, and it appears the courts are powerless to do any justice.

If municipalities are forced into bonding to exercise their power of eminent domain (to buy out affected homeowners, similar to excessive "airport noise"), or face the possibility of multiple lawsuits for devalued property, the taxpayer will be hollering for justice.

I respectfully concur but point out what I believe to be a serious flaw in what we are compelled to do today.